PET. EQ.

Case 20.

## City of Louisville vs. President and Trustees of the University of Louisville.

### APPEAL FROM JEFFERSON CIRCUIT.

1. The President and Trustees of the University of Louisville, as originally incorporated, constituted in law a person capable of receiving any grant of real or personal property which might be made to it, for the purposes for which it was incorporated; especially such as it was authorized by the charter to receive.

2. The Legislature have not an unrestrained power of legislation over charters granted to corporations for educational purposes, though a part of the funds be granted by a city or local public.

3. The city corporation of Louisville, though itself a civil institution, created and employed, to some extent, as an instrument of the government, is yet not the government, and may acquire corporate

rights which the government may not control. Such was the right to the property conveyed by the city, through the Medical Institute, to the University. Though public property in regard to Louisville, it was not so in regard to the State.

4. The act of the State in creating a corporation in a city, for purposes of education, was not such an assumption by the State of the duty of education as made the corporation a public corporation over which the Legislature had unrestrained power of legislation.

5. The charter through which the University received property from the city corporation contains no condition authorizing the city, in any event, to resume its control over the donation, or transfer it.

6. If property be received under a charter granted, there is thenceforth a right derived through contract, which is protected by the constitution; and the donor has no more power over his gift than a third person, (except the right to the reversion if the corporation become extinct,) nor any control over the fund.

7. A corporation is not a public corporation, in regard to which the State may legislate at pleasure, unless it be invested with political power; or created to be employed and partake in the administration of the government; or to control funds belonging to the State; or to conduct business in which the State alone is interested; or unless it be the mere instrument of the State, created for government purposes.

The facts of the case are fully stated in the opinion of the court.

*Wm. S. Bodley,* for appellant—

The corporation, called, the Medical Institute, received its *first* endowment from the city of Louisville under the resolutions of 1837, and this made it a public corporation. It was afterwards, with its consent, made subject to repeal by the act of 1839–40, page 174. To that repealable body, the endowment property was conveyed, with a view to its being afterwards conveyed by it to the University of Louisville, when chartered.

The university charter of 1846, was passed in order to create a corporation on this foundation by the city of Louisville.

There was no *gift or bounty* in the city endowment, it being made for the advantage of the city, the donor, and so the corporation is not eleemosynary but civil. (*Tomlin's Law Dic. Corporations,* 454; 1 *Black. Com.* 471; 4 *Wheaton,* 637, 640, 642, 681, 689; *Hill on Trus-*

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.

*tees*, 424; *citing* 1 *Condensed Eng. Chy.* 354.) Civil corporations are either public or private.

Municipal corporations are public and repealable. (See specially 4 *Wheaton*, 659–668; *also, People vs. Morris*, 13 *Wendell*, 331–337; 1 *Tucker's Blac.* 162; *McKim vs. Odom*, 3 *Bland's Chancery*, 418; *Terret vs. Taylor*, 9 *Cranch*, 52; *Fowle vs. Alexandria*, 3 *Peters*, 409.)

The *true* distinction between public and private corporations is that laid down by Chief Justice Marshall, in *Darthmouth College vs. Woodward*, on page 429–430, 4 *Wheaton's R.*

Judge Story's observation, (4 *Wheat.* 672,) that every corporation is exempt from legislative power, except "where its whole interests and franchises are the exclusive property and domain of the government itself," is not warranted by the court in that case, nor by any adjudicated cases except two, which adopted that dictum of Judge Story, viz: *Allen vs. McKean*, 1 *Sumner*, 276, and the case in 11 *Maine*, 118.

In discriminating between public and private corporations, the qualities of existence and succession, power and liability as to suits and contracts, power to buy and hold property, to have a seal and to make by-laws, must not be considered; because they are *common to all* kinds of corporations. (1 *Blac. Com.* 475; 4 *Wheaton*, 638.)

The charter of the University of Louisville, (1846,) "creates a civil institution to be employed in the administration of the government." And this, by Chief Justice Marshall's definition, makes it a public corporation.

Civil administration embraces every possible mode and form of government over the whole State or any part of it, as banks, hospitals, &c. (4 *Wheaton*, 629; *Ib.* 422.) (*Kentucky Board of Education*, 3 *Stat. Law*, 528; *County Commissioners of Schools*, 3 *Stat. Law*, 531; *District Trustees of Schools*, 534.) They have been altered by 3 *Stat. Law*, 539; *Acts* 1842–3, 72; *Ib.* 1843–4, 53; *Ib.* 1844–5, 45; *Ib.* 1848–9, 23; *Canal*

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

*Commissioners N. Y.* 13 *Wendell*, 331–335.)   Education is a government duty.   (*Vattel's Law N.* 104, 105, 109; 2 *Littel's Laws Ky.* 108; *Ky. Constitution, art.* 11, *sec.* 1; 4 *Wheaton*, 646.)   And though it is also a private duty it is not so in any sense that excludes the public government duty.

The question, whether a corporation for education is a public or private one, depends upon the "manner in which it was formed, and the objects for which it was created."  (4 *Wheaton*, 638.)

Dartmouth college, formed by private persons and funds to subserve the private duty of imparting education and promoting learning, was a private corporation.  (4 *Wheaton*, 634–635.)

The University of Louisville was formed by the public of Louisville, to accomplish the government object of education—and so was a public corporation.

A city, county, province, or colony is as much a public as the largest state or nation; of which it is part.  (12 *Gill & Johnson*, 426; 13 *Wendell*, 335; 1 *Cowen*, 262 *and notes*; *Jackson vs. Winn's heirs*, 4 *Litt.* 322; *McQuillen vs. Lexington*, 9 *Dana*, 522; 2 *B. Mon.* 150; 5 *Ib.* 109; *Cheaney vs. Hooser*, 9 *Ib.* 330; *Talbot vs. Dent.* 9 *Ib.* 537; 6 *Wheaton*, 695.)

State colleges, universities, hospitals, banks, &c., are public corporations, unless expressly made otherwise.  (4 *Wheaton*, 659–661; *Bracken vs. Wm. and Mary College*, 1 *Call.* 160; *McCulloch vs. Maryland*, 4 *Wheaton*, 421; *Briscoe vs. Bank Commonwealth*, 11 *Peters*, 327; *University of Alabama vs. Winston*, 5 *Stew. & Porter*, 7.)

There are corporate *uses* of property, which are fixed and beyond the legislative power, and yet do not impair the legislative power over the corporation that may *manage* them.   As wharfs, commons, &c. (*Cincinnati vs. White*, 6 *Peters*, 431; *Barclay vs. Howell*, 6 *Peters*, 498; *New Orleans vs. United States*, 10 *Peters*, 622; *Leclerq vs. Gallipolis*, 6 *and* 7 *Ohio*; *Falmouth vs. Horter*, 4 *Litt.* 121; *Kennedy vs. Covington*, 7 *Dana*, 58;

*Walker vs. Columbus*, 4 *B. Mon.* 259–261; *Augusta vs. Perkins*, 3 *B. Mon.* 437.) As fire companies in Louisville. (*Acts in City Laws*, 57, 62, 72, 92.)

The management of a trust is not necessarily in the hands of those in whom the title is vested. (*Norris vs. Abingdon*, 7 *Gill & John.* 7.)

The act of 1851, (city charter,) does not defeat the *use*, but changes the *management* only, of the university property: consistently with *Terret vs. Taylor*, 9 *Cranch* 52; 4 *Wheat.* 591.

The funds of the university are public funds, and therefore the corporation is public, according to 4 *Wheaton*, 629.

A state, county, and city agree in everything that distinguishes what is public from what is private.

Public property is held in trust, and therefore its diversion from public control and use will not be presumed. (*Binney's case*, 2 *Bland Md. Ch'y* 142; *Hill on Trustees*, 282, 516; *State, use W. Co. vs. Baltimore and Ohio R. R. Co.* 12 *Gill and John.* 436, 438–441; *Cheaney vs. Hooser*, 9 *B. Mon.* 330.)

The consent of the city to the change of charter, if necessary, is given, and its necessity does not make the charter of 1846 private and irrepealable. (*United States Constitution*, art. 1, *sec.* 10, *clause* 2; *Ib.* art. 1, *sec.* 8, *clause* 17.)

Private rights may attach to public property, and suit be brought for them against *public* corporations. (*Briscoe vs. Bank Commonwealth*, 11 *Peters* 327.)

Corporations, though public, or even sovereign, may be sued. (*U. S. Constitution*, art. 3, *sec.* 2; *Bank Commonwealth vs. Wistar, &c.* 2 *Peters* 323; *Bank United States vs. Planter's Bank Ga.* 9 *Whea.* 907; *Bank South Carolina vs. Gibbs*, 3 *McCord*, 377; 2 *Inst.* 703; *Cowper*, 79–87; 5 *Bingham*, 91.)

A repeal of a corporation does not affect vested rights. They may exist as to a public corporation, and will continue after repeal. (*Puffendorff, book* 1, *chap.* 6, *sec.* 6; *Dash vs. Vankleeck*, 7 *John.* 506; *State vs. Dews, R. M. Charlton's Geo. R; Tesh vs. Common-*

*wealth*, 4 *Dana*, 522.)   Cases reviewed, viz: *University of N. C. vs. Foy*, 1 *Murphy*, 58; *State Bank S. C. vs. Gibbs*, 3 *McCord*, 377; *Terret vs. Taylor*, 9 *Cranch*, 52; *Norris vs. Abingdon Ac.* 7 *Gill & John.* 7; *University Md. vs. Williams*, 9 *Gill & John.* 365–398; *Saint Mary's Church*, 7 *Serg. & R.* 534–559; *Plainfield Ac. School*, 6 *Conn.* 377.   Were private foundations or else, by express law made private or irrepealable corporations.

So in some degree were the cases of *Bowdoin College* and the *New Gloucester School*, though the decisions as to them recognized and carried out the departure from the law of the Dartmouth college case. (See *Allen vs. McKean*, 1 *Sumner*, 276; *Trustees New Gloucester School Fund vs. Bradbury*, 2 *Fairfield*, (11 *Maine*,) 118.)

Kentucky legislation abounds with changes of corporations for education.   Such as this, without consent of the corporators.   (2 *Littell's Laws*, 107, 108, 208, 234, 240, 378, 389; 3 *Littell's Laws*, 206, 207, 255, 277, 279, 409.)

The act 29th January, 1830, takes property from Jefferson seminary without its consent, and gives it to the city of Louisville which, by 7th section of the charter of 1846, gave it to the University of Louisville.

*Fry and Page*, on the same side—

We will not discuss the question whether the corporation of the university be public or private.   It will be seen by the resolutions passed at the Radical Church, on the 30th March, that it was intended to establish a college which would be alike beneficial to all the citizens of Louisville, in proportion to their property and business, and should be a general charge on all.   In all that was done by conveyance or otherwise a reference is made to those resolutions, and that idea is kept in view up to the act of 1846, establishing the University of Louisville.

It is true that the Medical Institute of Louisville was incorporated for the advancement of medical science; it slept, however, till it was taken as the incipient medium through which to establish a university, according to the resolutions of the Radical Church, and was merely a conductor of title from the city of Louisville to the university. So far as the university is regarded, the Medical Institute was merged in the university. The act to establish the university simply incorporates an institution of learning with certain powers, and refers to the Radical Church resolutions to show the purposes of the act.

The city intended its own benefit as she would have done by the incorporation of a bank, an insurance or manufacturing company. She never contemplated medical science or any other branch of learning as a charity; she intended to enrich herself. And the counsel for the defendant so admitted in the argument of the case. We regard the incorporation of the university as we regard the incorporation of a school or academy made upon the application of an individual for his own benefit, to be conducted by trustees. If the beneficiary should desire an amendment of the charter as to the number of trustees, or mode of appointing them, the trustees holding a naked trust could not object on the ground that the act of incorporation was a contract with them, with which the Legislature could not interfere.

Would it not be strange to contend that the trustees or directors of a bank, insurance, or manufacturig company, could object to any amendment to the the charter which the stockholders might desire the Legislature to make?

Such is the case before the court. The city of Louisville, the beneficiary of the university, asked the Legislature to make certain amendments or changes, which has been done, and the trustees having a mere naked trust, being in the employment of the city, by an act of the Legislature, can make no objection. The trustees are under no obligation to

hold the trust, and may relinquish it when they please, and can hold it only so long as the creator or beneficiary may permit.

The Dartmouth College case is not like this. There the beneficiary did not ask the change. If such had been the case, it is deducible from the opinion of the Chief Justice that it might have been done. No case cited in this case by counsel except the case from Alabama; that case is clearly for the plaintiff.

This court will perceive that this case is distinguishable from the cases relied on by the defense.

The Bowdoin and New Gloucester cases are, when scrutinized, wholly dissimilar. In both of these there was a restriction by the terms of separation between Maine and Massachusetts; and Justice Story decided the Bowdoin case on that ground, while he discusses at length another proposition, not material to the decision. He seems to have taken all opportunities to secure the power of trustees against legislative action.

The Gloucester case was permitted to rest on the State decision, doubtless because it was known that the terms employed by the separation of Massachusetts and Maine, before alluded to, would produce the same result. The consent of Massachusetts was necessary, as in the Bowdoin case.

If Louisville made this universtiy for her own benefit, and sought the aid of the Legislature to enable her to accomplish her purposes, we do not perceive why the act relied on will not be enforced, and why the city may not, by authority of the Legis'lature, from time to time, have such amendments of the university charter as the creator and beneficiary may deem proper.

*S. S. Nicholas and Bland Ballard,* for appellee—

The counsel for the appellee propose to show, 1. "That the President and Trustees of the Uuniversity of Louisville," is a private corporation.

City Louisville
vs.
Pres. & Trus.
University.

2. That the charter of every *private* corporation is a contract between the government which grants it, and the corporators, within the meaning of the constitution of the United States, and of the constitution of Kentucky, and therefore that the government cannot alter it.

3. We will then examine some of the enumerated alterations which the act of 1851 has attempted to effect in the charter of the university, and show that similar alterations in the charters of other private corporations have been uniformly held unconstitutional.

1. That the corporation of "The President and Trustees of the University of Louisville" is a private corporation, cannot, at this day, be considered an open question. When we look into the charter of the university, we find that it is an institution established for the promotion of learning; that none of its funds were derived from the government; that its officers are not appointed by the State; that they are invested with no political power; that they do not participate in the administration of civil government; that they are not agents of the government for the administration or discharge of public duties, but are private citizens appointed in a private way to administer a private charity. It lacks all the essential characteristics of a public corporation. It answers the very description of a private college, as laid down by Chief Justice Marshall, in *Dartmouth College vs. Woodward, 4 Wheaton,* 640. "It is an eleemosynary institution, incorporated for the purpose of perpetuating the application of the bounty of the donors to the objects of that bounty. Its trustees * * * * are not public officers; nor is it a civil institution, participating in the administration of government, but a charity school, or seminary of education, incorporated for the preservation of its property, and the perpetual application of that property to the objects of its creation." Those only are public corporations whose trustees and officers are

invested with some portion of political power, who partake, in some degree in the administration of government, and perform duties which flow from the sovereign authority. (See *opinion of same Judge, page* 604.)

Education is undoubtedly an object of national concern, and there may be an institution for the promotion of learning, founded by the government, and placed entirely under its immediate control, the officers of which would be public officers, amenable exclusively to the government. But the Louisville University is not such an institution. Education is not altogether in the hands of the government. Every teacher of youth is not a public officer, and donations for purposes of education do not necessarily become public property.

Judge Story says: "Public corporations are generally esteemed such as exist for *public political* purposes only—such as towns, cities, parishes, and counties; and in many respects they are so, although they involve some private interests; but strictly speaking, public corporations are such only as are founded by the government for public purposes where the whole interests belong also to the government. If * * the foundation be private * * the corporation is private, however extensive may be the uses to which it is devoted." (*Dartmouth College vs. Woodward, page* 668–9.)

There are many other authorities to the same point: *University of Maryland vs. Williams,* 9 *Gill & Johnson's Rep.* 397; *Allen vs. McKean,* 1 *Sumner's Rep.* 296, '7, '8, '9, &c; *Trustees of New Gloucester vs. Bradbury, Fairfield, Maine Rep.* 118; *Norris vs. Trustees of Abingdon Academy,* 7 *Gill and Johnson's Md. Rep.*; *Trustees of the University of North Carolina vs. Foy,* 1 *Murphy's Rep.* 88; *Case of St. Mary's Church,* 7 *Serg. and Rawle, Penn. Rep.* 559, 564–5; *Fuller vs. Plainfield Academic School,* 6 *Conn. Rep.* 544; *State Bank of S. C. vs. Gibbs,* 3 *McCord S. C. R.* 377; *Terret vs. Taylor,* 9 *Cranch Rep.* 52; *The People vs.*

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

*Norris,* 13 *Wendell N. Y. Rep.* 334; *Angell and Ames on Corporations,* 28–29 *and* 750; 2 *Kent's Com.* 4th *edition,* 275.)

The fact that a portion and much the larger portion of the funds belonging to the university was donated by the city of Louisville, does not make the corporation public. In the case of the *Trustees of New Gloucester vs. Bradbury,* 2 *Fairfield, Maine Rep.* 118, the whole fund belonging to the academy was the bounty of the city of New Gloucester, but it was held to be a private corporation and its charter irrepealable and unalterable by the Legislature, though the alteration was asked for by the city of New Gloucester. The same doctrine was maintained by Judge Story in *Allen vs. McKeen,* 1 *Sumner,* 299, and is maintained by an unbroken current of authorities. *Dartmouth College vs. Woodward,* 4 *Wheaton; Story's Opinion, &c., &c.* Even if the funds of the university had been derived from the government itself, that would not make it a public corporation. The government may as well bestow its bounty upon a private corporation for a charity as upon a public corporation; the source from which the bounty comes cannot change the nature of the corporation. If the corporation is managed by private individuals, who are not appointed by the government, or are not officers nor ministerial agents of the government, and who do not manage it for the government, the corporation is private, it matters not by whom founded. The gift by the city of Louisville to the corporation cannot change the nature of the institution, for that is as much private, in every legal sense, as the bounty of any individual. Indeed there is nothing better settled than that, even when the government itself bestows its bounty on a *private* corporation, the nature of the corporation is not thereby changed. (*Bank of U. S. vs. Planters' Bank of Georgia,* 9 *Wheaton,* 907 ; *Ten Eyck vs. Delaware and Raritan Canal Co.,* 3 *Han. N. J. Rep.* 200 ; *Turnpike Co. vs. Wallace,* 8 *Watts, Penn. Rep.* 316 ; *Seymon vs. Turnpike Co.*

10 *Ohio Rep.* 476; 1 *Burr. Rep.* 203; 1 *Ves.* 79, 467; 3 *Atk.* 674; *State Bank of S. Carolina vs. Gibbs,* 3 *McCord, S. C.Rep.* 377.)

The charter of the university was not granted to enable the city of Louisville to effect any municipal end. It in no respect relates to the government of the city. It is a corporation distinct from that of the city; it was created for different purposes—its design was to promote general education, and medical education particularly, and it is managed by private persons in a private way, who are in no way responsible either to the city or the government. It has, therefore, every characteristic of a private corporation.

2. Our second proposition is, that "the President and Trustees of the University of Louisville" being a private corporation, its charter is a contract within the meaning of that provision of the constitution of the United States which declares that "no State shall pass any law impairing the obligation of contracts," and therefore, that the Legislature of Kentucky has no power to annul, alter, or impair it.

This proposition is too well sustained by authority and too universally admitted to require any argument to support it. (*Dartmouth College vs. Woodward,* 4 *Wheaton,* 518–643; *Fletcher vs. Peck,* 9 . *Cranch,* 88; *Turrett vs. Taylor,* 9 *Cranch,* 52; *Allen vs. McKean,* 1 *Sumner,* 276; *University of Maryland vs. Williams,* 9 *Gill & Johnson,* 365.)

3. We have assumed that the act of 1851, if valid, does effect many alterations in the charter of the University of Louisville, and we suppose the correctness of our assumption will not be disputed. Indeed this suit is based upon the fact that an alteration has been made. It is founded upon the idea that all the property, rights, and franchises which were vested in the trustees of the university, by their charter, have been taken from them by the act of 1851, and vested in the plaintiff or other persons. It is founded upon the idea that the grant made by the "Medi-

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.

cal Institute to the university," on the 4th of April, 1846, has been annulled by the act of 1851 ; and if, as we have shown above, the charter of the university is a contract, whose inviolability is guaranteed by the constitution of the United States, it requires no further argument to prove, that the suit must fail. But recurring to the act of 1851, and the charter of the university, it will be seen—

1. That the number of the trustees is changed from eleven to sixteen.

This is one of the very changes which was attempted to be effected by the amended charter of Dartmouth College, and which is denounced by the Supreme Court as unconstitutional. (*Dartmouth College vs. Woodward*, 4 *Wheaton* ; *opinion of Chief Justice Marshall*, 652 ; *opinion of Justice Washington*, 662–664 ; *Story's opinion*, 710.) It was the same sort of a change in the charter of a college, which was decided unconstitutional by the Supreme Court of Maine, in the case of the *Trustees of New Gloucester vs. Bradbury*, 2 *Fairfield*, 118 ; by the Supreme Court of Maryland in the case of the *Trustees of Abingdon Academy*, 7 *Gill and Johnson*, 7 ; and of the regents of the University of Maryland, 9 *Gill & Johnson*, 355 ; by the Supreme Court of Connecticut, *Fuller vs. Plainfield Academic School*, 6 *Conn. Rep.* 544 ; and by Judge Story in the case of *Allen vs. McKean*, 1 *Sumner*.

2. The trustees, instead of being chosen by the mayor and council of the city of Louisville, are to be elected by the people.

A change less radical than this was held to be unconstitutional in the case of *Dartmouth College vs. Woodward*, 4 *Wheaton*, 652 ; in the cases reported in 2 *Fairfield*, and 7 *Gill & Johnson*, 7.

3. By the act of 1846, incorporating the university, the whole property and franchises of the corporation are entrusted to the exclusive control and management of a president and ten trustees, subject only to the terms of their charter.

By the act of 1851, they are committed to a president and sixteen trustees, subject, not to the charter of the university, but to the charter of the city of Louisville, and the ordinances passed by the general council.

4. By the first act, the trustees have no power to divert the profits, fees, or revenues of any department of the university from the use of such department.

By the last, the profits, fees and revenues of each department are intended to be subject to the unlimited control of the trustees and of the general council of the city of Louisville.

It cannot be necessary to refer again to authorities to show that these alterations cannot be constitutionally made, but in addition to those heretofore referred to, we now refer to *Commonwealth vs. Farmers and Mechanics' Ban*, 21 *Pickering*, 555.

5. By mere force of the act of 1851, the whole property acquired by the "President and Trustees of the University of Louisville" is taken from them and given to others.

The property of an individual or corporation cannot be taken and given to others, except by judicial process and after compensation, and it makes no difference whether the property be acquired by gift or purchase. (*Fletcher vs. Peck*, 6 *Cranch*, 88; *State of New Jersey vs. Williams*, 7 *Cranch*, 164; *Turrett vs. Taylor*, 9 *Cranch*, 43; *Pearce's heirs vs. Patton*, 7 B. *Monroe*, 162.)

The plaintiff contends that though the University of Louisville is a *private* corporation, though its charter is a contract within the meaning of the constitution, yet that is a contract between the city of Louisville and the State, a contract to which the State and the city are alone parties, and which they may therefore annul at pleasure.

This position is based on a misconception of the nature of the contract. The charter of a corporation, whether civil or eleemosynary, is an executed con-

City Louisville
vs.
Pres. & Trus.
University.

tract between the government and the corporators. (*Angell & Ames on Corporations,* 730 ; 2 *Kent's Com.* 305 ; 4 *Wheaton,* 643.) In the case of the *Trustees of New Gloucester vs. Bradbury,* 2 *Fairfield,* 118, the town of Gloucester was the sole founder of the school, and the donor of its funds, but it was held that the charter of the school could not, even on the application of the town, be altered in any respect.

The learned counsel for plaintiff contend that this is, in effect, a suit in which the grantor and the *cestui que use* of a trust have united, and are merely asking for a change of trustees. But this is not the nature of this suit. It is a suit in a common law court, not asking an order for a change of trustees, but a judgment for property. It is a suit in which the substantial grantor is the sole plaintiff, and the grantee the sole defendant. It is a suit by a grantor against her grantee, asking to recover property, formally and solemnly conveyed—suggesting no forfeiture, no violation of contract, no breach of faith, but proceeding on the naked ground that every grantor can annul his own deed voluntarily made, at his own pleasure, or by means of a legislative act. The *cestui que trust*—the benificiaries—are no parties to the suit, or if they are parties, in any sense, they are represented not by the plaintiff, but by the defendants. The inhabitants of Louisville are not the beneficiaries, but education, in the largest sense, and medical education particularly, are the only beneficiaries. The poor, education, and religion, are, in law, legatees or donees capable of receiving charitable bequests or donations. It matters not that such donees cannot sue in person. They appear in court and claim or defend by the corporation or trustees appointed to dispense the charity. (*Dartmouth College vs. Woodward,* 4 *Wheaton,* 646 ; *Moore's heirs vs. Moore's ex'rs,* 4 *Dana,* 354 ; *Vedal, &c. vs. Girard's ex'rs,* 2 *Howard,* 127 ; *Attorney General vs. Atherton Free School,* 3 *Mylne & Kean,* 544 ; *Attorney General vs. Mayor of Newberg, Ib.* 647 ; *Sutton's*

*Hospital*, 10 *Rep.* 33 ; *Whitman vs. Lea*, 17 *Sergeant & Rawle*, 88 ; *Mayor of Philadelphia vs. Elliot*, 3 *Rawle*, 170.)

The plaintiff has neither a legal nor an equitable interest in the property, and therefore will not, unless allowed by the particular terms of her deed, be permitted to complain of the management of the fund, even before the chancellor. The beneficiaries, only, can make such complaint, and this they must do, as they cannot do it through the corporation, their ordinary representative, in the name of the commonwealth, and in her courts of law. Such is the decision of the Supreme Court of Massachusetts in the case of *Sanderson vs. White*, 18 *Pick.*, and such, we understand, is the well settled law. (*Angel & Ames on Corporations*, 626, 627, 624, &c., &c.)

Again : plaintiff's counsel contend that the city's original deed to the Medical Institute was void. The argument is, that whilst the city has power to sell, for a consideration, she has no authority to give property away, and that the deed referred to was made without consideration, and is therefore void.

It is a sufficient reply to this argument to say, that the act of 1846, chartering the university, and the act of 1851, chartering the city of Louisville, (*art.* 14, *sec.* 14,) expressly confirm the deed, made by the city in 1837 ; and the act of 1846 expressly authorizes the execution of the deed to the university.

Independently of these acts, the deed is valid. All corporations, unless restrained by their charter, have as absolute a *jus disponendi* as a natural person. (*Angel & Ames on Corporations*, 153 ; 2 *Kent*, 280 ; *Binny's case*, 2 *Bland's Md. Ch'y Rep.* 141 ; *Talbot vs. Dent*, 9 *B. Mon.* 537.)

Lastly : it is contended by the learned counsel that the charter of the University was passed at the instance of the city of Louisville ; that the corporation was created for the purpose of being the trustee of the fund now in controversy, for the use or benefit of the inhabitants of Louisville, and therefore that it is

City Louisville
*vs.*
Pres. & Trus.
University.

not a contract between the State and the trustees, but between the city and the State, which the city and the State may annul at pleasure.

There is nothing in the charter of the university which requires its funds to be employed for the use or benefit of the inhabitants of Louisville only ; they are to be employed, not by officers of the city, or for any municipal end, not for any purposes connected with city government, but for the great end of enlarging knowledge. The argument here pressed is precisely the same as that which was urged by the learned counsel in the case of the *Trustees of the New Gloucester School Fund vs. Bradbury*, to which we have so often referred. In that case, the town of New Gloucester, holding certain lands for the use of schools, procured an act to be passed by the name of "the New Gloucester Schools in the county of Cumberland," authorizing the sale by them of said lands ; the putting of the proceeds at use ; appropriating the interest annually to the support of said schools; and empowering them to fill vacancies in their own board. It was provided that the number of trustees should not exceed seven nor be less than five. Afterwards the Legislature passed another act, at the instance of said town, which provided "that the inhabitants of the town of New Gloucester, qualified by law to vote in town affairs, be, and they hereby are authorized and empowered, at their annual meetings in March or April, to choose by ballot seven persons, inhabitants of said town, trustees of New Gloucester school fund, whose duty it shall be to take charge of and manage all the property, both real and personal, belonging to said fund." It was held, after full argument, that the last act was unconstitutional.

In conclusion we may be permitted to say, that here has been attempted not only a most palpable infraction of the constitution, but an invasion of those fundamental principles of right and justice which are inherent in the nature and spirit of the social compact, in the character and genius of the govern-

ment, and which rise above, and restrain and set bounds to the power of legislation. For the protection of that constitution and the preservation of those principles, the judiciary of the country is the appointed guardian, and to it the trustees of the university have appealed, in behalf of thousands of young men all over this land, to whom the institution, of which they are the trustees, has, in times past, dispensed, and will in future dispense the blessings of knowledge, with an abiding confidence in the justice of their cause, and with the strongest conviction that their appeal will not be in vain.

Chief Justice MARSHALL delivered the opinion of the Court—

By an act of February, 1833, (*Sess. Acts*, 300,) the Medical Institute, of Louisville, was incorporated for the advancement of medical science, with the right to acquire and hold property and to make by-laws for the advancement of its objects. In April, 1837, it was resolved by a meeting of the citizens of Louisville, held at the Radical M. E. Church, that there ought to be a college with medical and law departments, in the city of Louisville; that the square bounded by Eighth, Ninth, Chestnut, and Magazine streets, is approved for the location of a college; that it is sufficiently large for the buildings of a college proper, and also of the medical and law departments; that the mayor and council would act in accordance with public sentiment in Louisville, by donating said square for said college buildings; that the establishment of a college, with medical and law departments, would be alike beneficial and advantageous to all the citizens of Louisville, in proportion to their property and business, and ought to be a general charge upon all; that it is highly expedient and proper that the medical department of said college be established and put into immediate operation, with a sufficient endowment on the part of the city of Louisville to afford all the facilities for instruction in medical sci-

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.

Medical Institute chartered.

City Louisville
vs.
Pres. & Trus.
University.

ence which any college in the United States affords; and that it be recommended to the mayor and council to donate said square as above, to cause the proper buildings for the medical department to be erected thereon, and to provide a suitable library and apparatus for its use, at the expense of the city; and that said medical department be placed under the control and management of the trustees of the Medical Institute of Louisville.

In pursuance of these resolutions, and under an express reference to them, the mayor and council resolved to donate or appropriate the designated square, for the purpose of a college, and to erect buildings thereon, and provide a library and apparatus for the medical department. And, on the 21st day of November, 1837, a deed was executed under their authority, by which the said square was conveyed to the Medical Institute of Louisville, to hold for the uses and purposes, and upon the terms and conditions stated in the resolutions of the citizens and of the mayor and council. And the city covenanted to erect on said square, within the years 1838 and 1839, buildings for a medical college at a cost not exceeding $30,000. And the president and managers of the institute covenanted that in case a charter should be obtained for a college or university, they would, on request of the city, or of the mayor and council, convey to the trustees of said college or university, the said square and all the improvements thereon, and the library, apparatus, &c., belonging at the time to said establishment.

In pursuance of the covenant in this deed and of the resolutions referred to, suitable buildings were erected on the said square, and a library and apparatus were provided at an aggregate cost to the city of about $50,000. By an act of February, 1840, (*Sess. Acts*, 173,) the Medical Institute was authorized, among other things, to confer degrees in medicine, to establish professorships, and to hold the real estate, library and apparatus which it then possessed, under

the terms and conditions on which it was donated,
and such other estate, books, and apparatus, as might
be proper for such institute.   The right is reserved ◆
to repeal,. alter, or amend the charter, but not to af-
fect the right to the property.

Under these various proceedings, the medical de-
partment was organized and successfully conducted
by the Medical Institute, which, after the date of the
conveyance from the city, received some small dona-
tions of books, commencing in 1838, and not amount-
ing to more than $——, up to 1846.   In February,
1846, an act was passed (*Sess. Acts*, 135) to establish
the University of Louisville, to take effect on the
15th day of March, 1846.   On the — day of April,
1846, the' mayor and council of the city of Louis-
ville passed resolutions providing for having the
square which had been conveyed to the Medical In-
stitute, with the 'library, apparatus, &c., conveyed to
the trustees of the University of Louisville.   And on
the 24th day óf April, 1846, said conveyance was ac-
cordingly made.   The Medical Institute, and the
Louisville College, of which there are some traces in
the Statutes, were thenceforth merged in the uni-
versity.

The first section of the act to establish this univer-     University
sity, appoints eleven persons, by name, as trustees of     charter.
said university, to have perpetual succession by the
name of "the President and Trustees of the Univer-
sity of Louisville," with power to acquire and hold
estate, real and personal, sufficient to yield an annual
income of $40,000 ; and the first and second sections
confer all other usual powers of such corporations or
universities. The third section enacts that the trustees
shall from time to time choose from their own body a
president,"who shall hold his office during the pleasure
of the board, or such time as fixed by the by-laws, or
until-vacated by death, resignation, or removal from
the county, or removal by a majority of the trustees ;"
and that after the election of a president, the remain-
ing ten trustees shall class themselves into five equal

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.

classes, the first class to go out of office on the 1st of March, 1848, the second on the 1st of March, 1850, and so on. The mayor and council of the city—a majority of all elected concurring—are to fill the vacancies occurring by lapse of time, by the election of persons to hold the office for ten years, and are to fill vacancies arising otherwise, by an election for the balance of the term, provided that if they shall, from any cause, fail to fill any vacancy for thirty days, the trustees may fill the same. And, provided, that when the office of president shall become vacant, from any cause, the trustees may choose a president, *pro tem.*, until another trustee shall be elected, after which a president shall be chosen.

The fourth section provides for an annual report of the condition of each department, &c., from the president and trustees to the mayor and council, who shall have the right, at all times, of inquring into the same.

The fifth section provides for the disposition of donations, &c., among the departments, &c., according to the designation made by the donor. And special reference being made to the conveyance of the square above described to the Medical Institute, in accordance with the resolutions passed at the Radical Church, and to the stipulation for a conveyance of said square, with the improvements, library, apparatus, &c., by the said institute, on request of the mayor and council, to any college or university which might be chartered, &c.

The sixth section provides that when such conveyance shall be made to the president and trustees of the university established by that act, the Medical Institute shall cease to exist; provided, that neither the said president and trustees, nor the mayor and council of Louisville, shall ever appropriate the estate, real and personal, thus conveyed, to any other purpose than to the use of the medical department of said university, nor shall the profits, fees, or revenue of any department be diverted from the use of such department.

The seventh section repeals an act of January, 1840, for the benefit of the Louisville College, (*Sess. Acts*, 57,) and directs the proceeds arising from the sale, whether then or afterwards made, of the seminary lot in Louisville, to be applied by the mayor and council to the erection of buildings for the academic department of the university on the square above described.

The eighth section relates to the continuance or removal of the professors in the institute as professors in the medical department of the university.

The ninth section gives to one class in the academic department a right to attend, free of charge, one course of lectures annually on anatomy, physiology, and chemistry, and to one class in the law department, the right to attend, in like manner, a course of lectures on medical jurisprudence, and enacts that each department shall, if required, receive from the public schools of Louisvile a number of pupils not exceeding six, provided certain conditions are complied with.

Under this charter, and with the property received from the Medical Institute, the university, and especially the medical and law departments, were successfully conducted, and without, so far as appears, any cause of complaint, actual or alleged, in the performance of any of the duties, either expressly or impliedly, devolved upon them or on the corporation. Some additional donations of books, to the value of about $——, were made prior to 1851.

By the first section of the 10th article of an act to charter the city of Louisville, approved March 24, 1851, which is not the original, but a new charter of said city, it is enacted that at the first election of city officers under that charter, (which was directed to take place on the first Saturday in April, 1851, and annually thereafter,) there shall be elected by the qualified voters in each ward of the city, two persons qualified as before provided, as trustees of the university and public schools of Louisville, to constitute and be en-

New charter of Louisville.

City Louisville
vs.
Pres. & Trus.
University.

titled "the Board of Trustees of the University and Public Schools of Louisville." And that within three months after the first election, the trustees from each ward shall be divided by lot into two classes, one to go out of office in one year, and the other in two years, and that each ward shall annually thereafter elect one trustee, to hold office for two years, so that there being eight wards, there would be sixteen trustees, of whom one-half would go out of office every year, with the privilege, however, of re-eligiblity.

The second section of said tenth article vests in said board of trustees, subject to the provisions of *this* charter, and to the ordinances of the general council of the city, the control and management of the University of Louisville, and of the high school for females, and of the public schools of Louisville, and of the property and funds belonging thereto, &c. And the trustees are required by the third section to make oath or affirmation faithfully to discharge the duties enjoined by *this* charter and the ordinances of the general council of said city. By the fourth section they may make by-laws, not inconsistent with this charter or the city ordinances. By subsequent sections, various powers are conferred and duties prescribed, which it is not necessary to enumerate; among which is a provision for annual reports, to the general council, of the condition of the university, the high school for females, and the public schools of Louisville, all of which it was the design of this act to unite into one general system of education, under the management of the board of trustees constituted as above stated, and in subordination to the general council. It is made the duty of the first general council elected under the charter to create and appropriate a fund for the erection, establishment, and maintenance of said university and public schools, including buildings for the academical department of the university, and for the high school for females, for which purpose money is to be borrowed, if necessary; and for the maintenance of all these an annual tax

City Louisville
*vs.*
Pres. & Trus.
University.

is authorized and required to be levied : And it is provided that no portion of the property or funds held or raised for the university or public schools of Louisville shall ever be applied to the support of any school or schools not entirely under the control and management of the said board of trustees. The last section of the article enacts that said board of trustees and their successors, as herein provided for, shall take and hold possession of all property and funds set apart for the said university and high school and public schools, but that the university square, and all the property of the University of Louisville, shall be held to the uses and purposes set forth in the deed from the city to the Medical Institute, and in accordance with the resolutions passed at the Radical Church.

It is, however, provided by the tenth section of the thirteenth article of the charter of Louisville, that before the trustees elected under this charter shall acquire any right to hold and take possession of the University of Louisville, or its medical department, the rights shall be adjudicated and settled by the judge of the Jefferson Circuit Court, on a petition to be filed by the city of Louisville, on which the judge is to decide, according to his opinion with respect to the constitutionality or unconstitutionality of the provisions of this charter in relation to the University of Louisville, or its medical department, subject to the right of appeal to this court.

The board of new trustees was elected in April, 1851 ; and under the provision just stated, the city of Louisville, in June, 1851, caused a petition to be filed in the Jefferson Circuit Court, in her name, setting forth or referring to the preliminary facts, alleging the constitutional validity of their title under the charter of 1851, and asking that the president and trustees of the University of Louisville be decreed to surrender the said university and medical department to the trustees elected under the new charter. The president and trustees of the university insist upon

*The point presented for adjudication.*

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.
the invalidity of the legislative provisions under which the claim is made, and referring also to the facts corroborative of their own rights, pray to be quieted and confirmed in their claim and title, which was in effect decreed by the Circuit Court. And the city brings the case to this court for a reversal of the decree, and for the establishment of her claim, or of that of the new board of trustees, which she asserts.

Under the general inquiry whether the provisions made in the new charter of Louisville respecting the University of Louisville, are constitutional, two principal questions are presented, viz: 1. Is the original charter of the university entitled to the protection of the constitution either of the State or of the United States, on the ground of being a contract, and as such, withdrawn from the legislative power of the State? And, 2. If it be such a contract, does the tenth article of the charter of Louisville violate the original charter of the university, in any of those particulars in which as a contract it is placed beyond the reach of legislation by the constitution?

If the first of these questions be answered in the affirmative, a similar answer to the second is so palpably a matter of course, that it does not require, and scarcely admits of discussion. The tenth article of the charter of Louisville is in fact a new charter, and if it may not properly be called the charter of a new university, it is certainly the charter of a new corporation. It does not, in terms, abolish or annihilate the pre-existing corporation. But it deprives it of everything that is essential to its continued existence. It takes from it its property conveyed to it by solemn deed in perpetuity. It takes from it the university which, by the first charter, had been committed to its charge and management. It strips it of the faculties, franchises, patronage and privileges, and of all the powers and rights pertaining to it as the visitor, governor and legislator of the university. It deprives it of that source of continued and vigorous succession which the biennial election of one-tenth of

its members by the public authorities of the city pro- <span style="float:right">CITY LOUISVILLE<br>*vs.*<br>PRES. & TRUS.<br>UNIVERSITY.</span>
mised to supply.   And if it leaves to it the power of
keeping up a succession by its own act, it deprives it
of every other power and of every right and faculty
which might constitute a motive for self-perpetuation.
If it does not actually and at once exterminate it, it
withdraws from it all the sources of life, and leaves it
to perish by inanition.

The new charter contained in the tenth article of
the charter of Louisville is not merely an amend-
ment of the original charter :   It does not merely
change the number of trustees, or the mode of their
election, or the term of office, or the manner in which
they are to exercise their powers, or to administer
their property :   It creates a new body of trustees, by
a new mode of election and for a new term of office,
and it takes from the old trustees and confers upon the
new ones all the property, and, practically speaking,
all of the rights and powers which, under the original
charter, had belonged to the original trustees and their
successors ;   and it places the whole under the direct
control of the general council of the city of Louisville.
Under these circumstances, it is unnecessary to insti-
tute any detailed comparison between the old and the
new charters.   The question is not whether the uni-
versity is more likely to flourish and to dispense the
expected benefits to the community under the new
than under the old organization ;   nor whether the
plan by which all the schools of the city are to be
placed under the same management as the university,
with the promises of additional and permanent sup-
port from the city, and all to be under the supervision
and control of the city councils, constitute such in-
ducements as render the change desirable, and should
lead to general acquiescence in it ;   nor whether such
advantages as are secured or promised by the new
charter, might not have been as well secured by means
of the original corporation, with such enlargement
of powers and means as might have been deemed
necessary, and would probably have been acceptable.

City Louisville
vs.
Pres. & Trus.
University.

These are not judicial questions. The trustees under ✓ the original charter professing to act, so far as the university is concerned, for the interests of education, and of those for whose benefit, as the future recipients of education, the university was established, protest against the changes effected by the new charter, not merely on the ground of expediency, but on the ground of right—of right founded on contract and made inviolable by the constitutions of the State and of the United States, but which, if this new charter takes effect, is not only impaired but absolutely destroyed. They claim protection especially under that clause of the constitution of the United States which declares that no State shall pass any law impairing the obligation of contracts. And as it is manifest, as already shown, that the tenth section of the new charter of Louisville abrogates, in substance, the original charter of the University, and vests in a new corporation the rights and powers and property of the old one, the real question in the case is, whether the rights and powers and property conferred upon the original corporation, or acquired under its charter, do stand upon the basis of contract, and are protected by the constitution from impairment by legislative act against its own consent, or whether they are held merely by sufferance, and are dependent upon the legislative will for their continuance.

1. The President and Trustees of the University of Louisville, as originally incorporated, constituted in law a person capable of receiving any grant of real or personal property which might be made to it, for the purposes for which it was incorporated; especially such

That the trustees of the university, as originally incorporated, constituted in law a person capable of receiving any grants of real or personal property which might be made to it for the purposes for which it was incorporated, and that it was especially capable of receiving the donation intended for it by the city of Louisville, the conveyance of which to this corporation is sanctioned by legislative authority in the charter itself, has not been and cannot be denied. But it is contended that although the corporation had a right to receive, and the city to make this donation, and although it was in fact made and accepted by solemn deed, and although this corporation, by its charter

and by the terms of the donation, was bound, and in fact undertook to administer the donation and all of its powers and duties for the purposes and in the manner prescribed by the charter, yet the donation may, by the co-operation of the city as donor, and the Legislature of the State as sovereign, or as grantor of the charter, be taken from this corporation during its existence and given to another, or that the same end may be, accomplished, by repealing or exterminating the first corporation, and re-disposing of the property which, by its extinction, might revert to the grantors.

The foregoing is a statement of the effect rather than the terms of the proposition maintained on the part of the city, and it is maintained upon the ground that the university from the beginning was and is a public and not a private corporation, and that being a public corporation, it derives no protection from the clause of the constitution which has been referred to, but is subject to repeal or modification, at the legislative discretion. This argument, it will be perceived, does not require the consent or co-operation of Louisville to authorize the destruction of this corporation or the divestiture of its property by legislative act. And if the grounds of this argument be true, not only the existence and rights of the corporation, but the property which had been given to it by the city of Louisville, and the purposes to which it should be appropriated, are subject to the Legislative will and discretion, without the necessity of any consent or co-operation on the part of Louisville, or of the corporation to which the gift was made. The fundamental proposition on which this argument is based, is found in the opinion delivered by Chief Justice Marshall, in the case of the *Dartmuoth College vs. Woodward*, 4 *Wheaton*, 629-30, containing the following comprehensive proposition, now quoted and relied on as the true American rule for distinguishing a public from a private corporation : "If (says the Chief Justice) the act of incorporation be a grant of political power, if it create a civil institution to be

---

*City Louisville vs. Pres. & Trus. University.*

as it was authorized to receive.

2. The Legislature have not an unrestrained power of legislation over charters granted to corporations for educational purposes, though a part of the funds be granted by a city or local public.

City Louisville
vs.
Pres. & Trus.
University.

employed in the administration of the government, or if the funds of the college be public property, or if the State of New Hampshire as a government be alone interested in its transactions, the subject is one in which the Legislature of the State may act according to its own judgment, unrestrained by any limitation of its power imposed by the Constitution of the United States."

In applying this proposition to the present case, it is contended that the University of Louisville, as first chartered, was a civil institution, created to be employed in the administration of the government, and that its funds were public property; and it is argued that coming thus within two of the conditions laid down in the proposition relied on, it is also embraced within the conclusion which declares all such corporations to be subject to the legislative power of the State, unrestrained by the constitution of the United States. If, according to the real meaning of the proposition relied on, the premises on which this conclusion rests were established, it cannot be denied that on the authority of the same proposition, the conclusion itself would also be established. But in proportion to the weight of authority conceded to the proposition itself, so is the necessity, that in giving effect to it, its terms should be fairly interpreted and its principles properly applied.

The fact that the conclusion announced in the proposition quoted, subjects to the unrestrained legislation of the States, the corporations therein described, and thus withholds from them the protection which, as the case referred to decides, the constitution affords to other corporations, renders the true ground of discrimination of the utmost importance; and even if it were shown that according to an interpretation which might be given to the proposition relied on, the University of Louisville might be brought within the class of corporations excluded from constitutional protection, the importance of the subject, no less than justice to the judge and the

court, on the authority of whose judgment the rule of discrimination rests, demands that the rule should be understood and applied in the sense in which those having authority to establish it used the terms in which it is announced, and intended them to be understood by others. It is in this sense, and in this alone, that the language used is to be regarded as expressing the rule intended to be announced or established. And in ascertaining this sense, not only the words of the proposition intended to convey the rule, but, if necessary, the context, the subject matter, the effects and consequences of any proposed interpretation, and all other legitimate sources of exposition may be resorted to, and should be exhausted, rather than to adopt a construction involving either obvious anomaly or injustice.

In view of these sources of exposition, from the language itself in which the proposition in question is expressed, from the nature and terms of the several conditions therein stated, and of the conclusion applied to them, and from a more extended view of the general principles and scope of the opinion, as an entire and consistent exhibition of thought and reasoning, we are satisfied that in speaking of the government and the public, in the sentence quoted, it was not intended to refer to whatever might, in any sense be termed a government or a public, but that the reference was to that government which could or did create the corporation, and to that public which it represents; in a word, to the government and public of the State whose power was the subject of consideration; and not to any subordinate community or local public within the State. Indeed, the several descriptions or conditions of the corporations which, according to the proposition, are subject to the legislative discretion, though somewhat variant in the circumstances mentioned in each, seem each to present and to be founded on the one general idea, that the corporation referred to is the mere instrument or agent of the government, through which it exer-

3. The city corporation of Louisville, tho' itself a civil institution, created and employed, to some extent, as an instrument of the government, is yet not the government, and may acquire corporate rights which the government may not control.—Such was the right to the property conveyed by the city, through the Medical Institute, to the University. Though public property in regard to Louisville, it was not so in regard to the State.

City Louisville
*vs.*
Pres. & Trus.
University.

cises some of its political or administrative powers and functions, or manages for its own purposes the public property of the State, or conducts transactions in which the State alone is interested. A very little reflection will suffice to show that any corporation coming within either of the conditions mentioned in the proposition must so far be the agent or instrument of the government, and should therefore, in reason and propriety, be to the same extent subject to be controlled and changed by it. Hence it might be assumed that the Chief Justice intended to assert the existence of an unrestrained legislative power, with respect to such corporations only as may be characterized as the agents or instruments of the government. Various passages confirming this assumption might be quoted from the opinion. In one of these it is expressly said, that the right to change these corporations "is not founded on their being incorporated, but on their being the instruments of government created for its purposes;" and in others the officers of such corporations are regarded as officers of government.

The two other opinions delivered in the case, and which concur in the general conclusions stated by the Chief Justice, certainly do not enlarge the class of corporations declared by him to be subject to the legislative discretion, nor place their subjection upon any new or different principle. Nor do we perceive that there is any essential difference between the three opinions with respect either to the nature of the corporations declared not to be protected by the constitution, or to the extent of the legislative power over them.

The opinion of the Chief Justice does not, like the others, take up the division of corporations into such as are public and such as are private, and of course does not discuss, with reference to this classification, the question of constitutional protection or legislative power. Without giving any general name to the corporations declared to be unprotected, that

City Louisville
vs.
Pres. & Trus.
University.

opinion merely states the circumstances or qualities, the existence of which, in a corporation would subject it to the legislative discretion, and on the ground, as we have seen, that such corporation is thereby proved or caused to be the agent or instrument of the government, created for its purposes. If it cannot be certainly assumed that no other corporation was intended to be embraced, but such as is fully described by the qualities or circumstances enumerated, and such therefore as is wholly and merely the instrument or agent of the government, the assumption that any other was contemplated is even less probable. The enumeration or description was mainly introduced, as is manifest from the preceding context, to illustrate a limited construction of the constitutional clause, which would leave the States free to control or alter such corporations as are created for the purposes and as the instruments of internal government. It was not essential to this object nor to any purpose of the argument in that opinion that any question should be stated or discrimination made with respect to the rights or interests of corporations of a mixed character, or of such as being to a certain extent or principally the instruments of government created for its purposes, are yet authorized to act in some respect in a different character, and may acquire or dispose of property or valuable rights, not as mere agents of the government and for its uses, but in a distinct and separate right, and for the benefit of the corporation or its corporators.

Of this latter description are municipal corporations referred to in the opinions of Judges Washington and Story, as examples of public corporations: the latter judge saying that they are generally regarded as public, and in many respects are so, although they involve some private interests; which interests he considers as being excepted from the legislative power. In making this exception, Judge Washington substantially concurs, and both of these judges refer to the case of *Terret &c. vs. Taylor*, 9

City Louisville
vs.
Pres. & Trus.
University.

*Cranch*, 52, in which this limitation upon the legislative power, over even public corporations, is expressly declared in the only opinion delivered, and which must have had the concurrence of a majority of the court, and presumably of the Chief Justice himself. The effect of this exception is to admit that a municipal corporation may be capacitated to acquire property by its own means and for its own purposes, or for those of the corporators, and that the legislature cannot, in the exercise of its power over the corporation, divert such property from the uses of those at whose expense and for whose use it was purchased. The silence of the Chief Justice under the circumstances stated furnishes no ground for inferring his disagreement to a proposition so obviously just, the special notice of which was not necessary in the view of the subject presented by him, and his assent to which, as evidenced by his silence in the case of *Terret &c. vs. Taylor*, must be presumed to have continued. It is in effect conceded by the counsel in this case, that the limitation of the legislative power, as expressed by Judge Story, has been generally received and quoted as the true rule upon the subject; which we attribute to the fact that the proposition containing it is considered more comprehensive and explicit, and therefore deemed more practically useful, than the proposition announced by the Chief Justice. When a corporation is the mere instrument of government its franchises belong to the government. And we take the limitation referred to, with respect to the property of a municipal corporation, as standing at least upon the authority of *Terret vs. Taylor*, again recognized by three of the judges in the Dartmouth College case, and contradicted by none of the five who concurred in the principal judgment.

If, as reason and observation prove, and as the authorities referred to assume, a municipal corporation may acquire property which does not thereby belong to the State, and may appropriate it to uses which

the State cannot defeat or control, it is not, in such acts of acquisiton and appropriation, the mere instrument or agent of the government representing and acting for it, and these acts, though done under the authority of law, cannot be regarded as acts of the State or its government, or as a part of its administration, nor can they of themselves impart that character to the object of the appropriation, nor subject it to a legislative power which did not attach either to the object of the appropriation or to the property itself before it was thus appropriated: but such property, so far as the State is concerned, has all the attributes and is entitled to all the protection of private property.

Then the city of Louisville, though itself a civil institution created to be employed to some extent as an instrument of the government, was not and is not the government itself, but a distinct though subordinate being; and although, as a public corporation, it holds its existence and its peculiar forms and faculties at the will of the government of which it is an instrument, or in some sense a part, it is not so identified with it that all its acts and acquisitions must necessarily be ascribed to the government, or enure to its benefit, either in point of interest or of power. Louisville might hold property for herself and her corporators, she might contract with individuals or other corporations with respect to her peculiar interests, and might certainly contract with the State; and even if abolished as a corporation, the State would not thereby become the beneficial proprietor of her rights of property or contract, but these would remain subject to the uses for which she had lawfully acquired or appropriated them. That the property given by the city, through the Medical Institute or otherwise, to the university, was the property of Louisville and not of the State, is, we think, unquestionable. If, while it belonged to Louisville, it might with reference to the local community be deemed public property, it was not public with reference to

*Margin notes:*

City Louisville
*vs.*
Pres. & Trus.
University.

4. The act of the State in creating a corporation in a city, for purposes of education, was not such an assumption by the State of the duty of education as made the corporation a public corporation over which the Legislature had unrestrained power of legislation.

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

the State. When the ownership of Louisville ceased, it was no longer public in the local sense referred to. And if the ownership and disposition of it by Louisville were not otherwise legal and valid, they were certainly so by the express authority and ✓ sanction of the legislature. Then why do not the same circumstances, which, if an individual instead of the city of Louisville had been the donor, would have given to the charter the character and stability of a contract protected by the constitution against legislative interference, also give to the actual charter and donation of Louisville the same character and the same inviolability? The property conveyed did not become public property and subject to the will of the State by being conveyed to the university, unless that institution was itself a mere instrument and agent of the State, and a public corporation. And it being certain that neither the fact of its being incorporated by the State, nor the fact that it was incorporated for the accomplishment of objects of general or public interest, made it a public corporation, subject as such to the public will and judgment; the question still recurs, why must this institution, founded and maintained by means not derived from the State, and in which the State had no other interest and apparently no other control than in any and all other incorporated institutions, be regarded as a public corporation, and in virtue of that name and character be debarred from the protection which the constitution affords to private corporations? Is it because it was incorporated and endowed with the special view of promoting education?

5. The charter through which the university received property from the city corporation contains no condition authorizing the city, in any event, to resume its control over the donation, or transfer it.

It is said that the promotion of education is a proper object and duty of government, as well as of individuals; and it is argued that the university, having been incorporated and endowed for the promotion of education and in performance or pursuance of this duty, was an institution created for the purposes of government and to be employed in its administration; and it is contended that on this ground

the corporation was properly subject, under the rule
before considered, to the unrestrained power of the State, or at least to the joint and co-operative will of the State and the city of Louisville. But here again we must discriminate between the State which created and the city, which, with its own property, endowed this corporation. The single act of incorporating the university was not such an assumption by the government of the duty of education as made the corporation its instrument or agent for the performance of that governmental duty. It was only the creation of an instrument to be adopted and employed by others for the purpose of promoting education. And no other power resulted to the State from the nature of the object to be accomplished, than such as results in other cases in which a corporation, created for purposes of general interest is furnished by the State with powers and capacities, and subjected to contingent duties, but for the means of exercising its powers and performing its duties is left wholly dependent upon contributions of money or property to be made by others, either gratuitously or with a view to a profitable return. Did the city of Louisville then, by endowing this corporation, or by any influence which her wishes or her promise of an endowment might have had in procuring or in shaping its charter, acquire any power over the corporation which the charter did not give? On the contrary, did she not, by making the gift to the corporation, whether in pursuance of a previous engagement or not, subject to the charter not only the property given but her own will with respect to it? It seems impossible that by this act done under the authority of the charter, and by which Louisville approved and bound herself to and by it, she should acquire a legitimate power over it. Whtaever influence she may have had in procuring its enactment it was the will of the Legislature and not her will which gave to it the force of a law. And as it was enacted by the will of a superior, to which she was herself sub-

City Louisville
*vs.*
Pres. & Trus.
University.

ject, and whose will she had no original power to thwart or set aside, it follows that so far from her being able to communicate to the Legislature any new power over the charter or the corporation, there was no other possible source but the will of the Legislature from which she could herself have derived such a power. In the original charter therefore, and such amendments as the Legislature might lawfully make, she must find at once the grant and the limit of her entire power on the subject.

6. If property be received under a charter granted, there is thenceforth a right derived through contract, which is protected by the constitution; and the donor has no more power over his gift than a third person, (except the right to the reversion if the corporation become extinct,) nor any control over the fund.

The charter does give to the city, through an election by her municipal council, the power of filling vacancies as they may occur in the body of incorporated trustees. But this power, which may secure to her some gradual influence in determining the action of the corporation, was intended as a means of perpetuating and not of destroying it, as a privilege to be exercised under the charter, and not to place her above it; and the succession may be kept up by the corporation itself, even if the city should fail or unreasonably delay to act. Other means of influence may have been expected, and have probably been found by Louisville in her wealth and numerous population, and in the locality of the university and its trustees within her limits, which could not fail to insure a due consideration of her interests so far as they might be involved in the acts of the corporation. But be this as it may, she gave her property to the corporation precisely as it was, and chose it in the shape in which it was created by the Legislature as the permanent, the perpetual instrument for appropriating that property, not for her own exclusive benefit, but to the purposes and in the manner indicated by the terms of her gift and of the charter, in which both her will and her power, with respect to its disposition, were merged and exhausted. The charter confers upon the city of Louisville no legislative power whatever. It gives no right to revoke her gift, no power to effect in any manner either the charter or the corporation, unless it be by the occa-

sional election of a trustee to fill a vacancy. Her legal relation to the corporation as originally created was in no respect different from that of an ordinary or individual donor, having power by the charter to fill vacancies as they might occur. If she had regarded her donation as justly entitling her to a more direct power in the corporation or to any power over the charter, she should have bargained for it in the charter, and before her gift was made. The charter in fact contains the conditions and trusts upon which all donations to the corporation are to be made. It is a part of the contract of donation between the donor and the corporation. And the law which binds the individual donor by all the terms of this contract, applies with equal force and with the same effect to the municipal corporation which assumes the position of a donor. It was just as incompetent for such a donor as for any other either to revoke a donation actually made, or to impose new terms or duties upon the donee. If Louisville had made a valid conveyance to individuals for the purposes of education, or if she had made a valid gift to any pre-existing corporation for similar purposes, or if her conveyance to the Medical Institute had reserved no future control over the property, it would have been seen at once that neither her character as a municipal corporation, nor her assumption of the duty of education gave her any peculiar right or privilege over either the donee or the donation. And if the Legislature acted upon her request, or yielded to her dictation in chartering the university, this circumstance, while it tends to prove that the charter was precisely what she then desired it to be, does not prove that it was intended exclusively for the promotion of her interests, and furnishes no plausible ground for implying that it was afterwards to be altered according to her future judgment or caprice. With those who determined on the donation to it, the fixedness of its form and the promised perpetuity of its existence must have had influence, or why did

City Louisville
vs.
Pres. & Trus.
University.

they ask for this charter, or make the gift under it? So far then was the State from being under obligation to revoke or alter the charter in conformity with the fluctuating will or judgment of Louisville, it was rather under obligation to the donors to maintain the corporation in that form in which the donation had been invited and actually made. It is conceded, however, that if the State alone on the one side and the city of Louisville alone on the other, were parties to and interested in the obligations arising from the charter and the donation, they might mutually release or modify these obligations as they might think proper. But the corporation itself created by the charter to receive donations and to appropriate them to purposes of general as well as of local interest, was a party both to the donation and to the grant of the corporate franchise, each of which was consummated by acceptance. And even if the mere acceptance of the franchise, which, if there be no property or other object of value involved, might impose only a contingent duty, did not bind the faith of the State to its continuance, the making and acceptance of a substantial donation, whereby property became involved in the charter, and actual and immediate duties were imposed upon the corporation and assumed by it, must, unless the corporation be of such a character and bear such relation to the State, as that a donation to it is in effect a donation to the State, have imposed upon the State an obligation to continue the corporation with the capacities which enabled it to receive the gift, and to assume the correlative responsibilities and to perform the corresponding duties. The charter promises this continuance not only to donors who give upon its invitation, but to the corporation itself which is made the instrument of inviting and receiving the gift. And as the donation makes the promise binding in favor of the donor, so the assumption and performance of the consequent duties on the part of the incorporated donee, is a sufficient consideration to make the promise obliga-

tory in its favor.  And although the corporation as
an artificial being may have no interest or merit
which should raise this obligation in its behalf, it is
to be recollected that it is the chosen trustee both of
the State and of the donors for accomplishing all the
objects of the charter, and the peculiar representa-
tive of all who are to receive the benefit of its faith-
ful execution.   Clothed with these interests, whose
importance, as admitted by all, and as attested by
the charter and by the endowment, deserves the
highest consideration, it is not only a capable but a
meritorious party to the contract by which its rights
and duties are defined and protected.

It is clearly settled in the case of the *Dartmouth
College vs. Woodward, supra,* that when individuals
make a donation for charitable purposes to a corpo-
ration created at their instance to receive and ad-
minister it, there is a contract for the substantial
maintenance of the charter, to which the constitu-
tional protection applies with full force.   Some of
the judges seem to have considered that such a con-
tract arises between the government and the corpo-
ration by the mere acceptance of the charter, irre-
spective of any endowment.   But if there be an
endowment, the opinion is clearly expressed by the
Chief Justice, and concurred in by a majority of the
court, that there is a contract to which the donors, the
government and the corporation, (that is, the trus-
tees,) are the original parties.   It is also expressly
laid down in the same case, that where trustees are
incorporated to administer a charity, and the endow-
ment is made by individuals, the donors have no
longer any interest in the property while the corpo-
ration exists, but only a reversionary right in case of
its extinction ; and that the present rights of property
are vested in the trustees, who, under the charter,
represent the donors as well as the objects of the
charity, and may vindicate against wrongful assault
both the property and the franchises of the corpora-
tion ; while the donors as such have no present right

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.

7. A corpora-
tion is not a
public corpora-
tion, in regard
to which the
State may leg-
islate at pleas-
ure, unless it be
invested with
political power;
or created to be
employed and
partake in the
administration
of the govern-
ment; or to con-
trol funds be-
longing to the
State; or to
conduct busi-
ness in which
the State alone
is interested; or
unless it be the
mere instru-
ment of the
State, created
for government
purposes.

in the matter, unless it be that of appealing to the courts to coerce a compliance with the charter. The same doctrine with respect to the rights of the donors and the trustees is found in other cases and in elementary treatises on the subject of corporations. (*Angel and Ames on Corporations*, 684.)

According to these principles the concurrence of the donors in any legislative act injurious to the corporation and inconsistent with the charter, would be of no avail, not only because they have transferred their rights and vested their powers as donors in the trustees or corporation, but because the incorporated trustees from a third party to the contract which, there being no reservation to that effect, can no more be dissolved or mutually changed than it could have been originally made without their consent. And in the case of the Dartmouth College the consent or dissent of the donors is not referred to as affecting the question of legislative power. Has this third party then, created by the supreme power in the State for the very purpose of receiving donations from Louisville and others, and of administering them, for accomplishing the important objects of the charter, no rights, or are its rights to be disregarded, because Louisville, a municipal corporation subject to the same supreme power, is the principal or only donor? Can it be true, that the State is under an inviolable obligation to respect the rights and maintain the existence and form of this third party, if it receive donations from individuals only, and that in that case the obligation cannot be released by the donors, not even although every citizen of Louisville should contribute ratably to a donation equal in amount to that which Louisville has given, and yet if Louisville, in her corporate character, be the only donor, there is no such obligation on the part of the State, or none which may not be released by the donor? If this be so, what becomes of the objects to be effected by the charter, and which constituted the presumed consideration for granting it? What becomes of the inter-

est of those who were to be benefitted by its fulfillment? How are they to be represented, and how are they to be secured? And how is it that a municipal corporation as donor retains or acquires rights which individual donors cannot have, rights inconsistent with the donation; inconsistent with the charter of the donee, and which involve the destruction of its objects? Or how is it that the State retains such rights if the donor be a municipal corporation, and in that case only?

If the city of Louisville, or the government of the State, or both, in co-operation, could destroy this corporation to which the property of Louisville was given, or could take the property from the original donee and vest it in a new corporation, and thus in effect abrogate the original charter which constituted the law of the gift as well as of the corporation, we see nothing which can prevent the same power from changing altogether the uses of the property, and diverting it to purposes entirely new. But the State did not possess this unrestrained power over the corporation, because the corporation was not invested with political power, nor created to be employed and partake in the administration of government, nor to control funds belonging to the State, nor to conduct transactions in which the State alone was interested; because in a word it was not the mere instrument or agent of the State, created for its purposes or for purposes of the government, and therefore the State was bound, if not by the mere acceptance of the charter, by the making and acceptance of donations under it. Louisville, on the other hand, did not possess the power, because the charter of the corporation in question considered as a legislative act of the State was beyond her control, because, whatever may have been her power or dignity in other respects, her dealings with others in the way of contract and in the acquisition or alienation of property, were subject to the general law which regulated the similar transactions of individuals, and by that law

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.

her lawful contracts were binding upon her, and her lawful alienations of her property as obligatory and as irrevocable as if made by an individual. Her donation being therefore irrevocable, and its conditiofis and considerations as expressed in the charter, being as much a part of the contract of donation as if it had been written out in the deed, the charter was obligatory upon her as a part of her contract with her donee, and was on this ground also beyond her separate control.

And although it be said, that in making the donation the trustees of the university, Louisville made that corporation the instrument of dispensing her bounty or her charity, yet as the charter was the only authoritative law of its being and action, in adopting the corporation as her instrument she adopted the charter as expressing her permanent will with respect to it. It was then her instrument in no other sense than it would have been the instrument of an individual donor; since each would be equally bound by the charter, and equally powerless to make or unmake the corporation; and each would be under the same obligation to permit the donee to perform its prescribed duties, and each equally precluded from imposing a new condition or requiring a new consideration for the gift. Nor do we perceive that this equality of condition, of rights and obligations, is at all effected by assuming that the donation of Louisville was an assumption thus far of the duty of promoting education, and that the university was incorporated in order that she might, by her proposed donation or endowment, make it an instrument for that purpose. If this be so, the case was precisely the same with respect to the charter and endowment of Dartmouth College, with the single difference that in that case the instrument was furnished to individuals and endowed by them, and in this case it is furnished to a municipal corporation, by which it is endowed. The fact still remains that the instrument was created not by the municipal corporation whose purpose, as well

as those of the larger public, it was to subserve, but
by the legislative power of the State, which gave to it the stability and authority of a law, and that it was not made an instrument according to the varying pleasure of the municipal corporation which endowed it, but only in the form and to the extent prescribed by the law which created it.   It was only under the charter and in accordance with its provisions, that the incorporated trustees of the university assumed the character and duties which made that corporation an instrument for the purposes of Louisville, and of any other donor, and it was an instrument for those purposes so far only as they were provided for in the charter.   Nor are those purposes of a character so exclusively local as to authorize the inference, on that ground, that the corporation either was or should have been created as the mere instrument for the performance of the municipal duties of Louisville, or that it either was or should have been subjected to her will further than is done by the charter.

It seems to us, therefore, under every aspect in which we have been able to consider this case, that the trustees of the University of Louisville, as originally incorporated, are entitled to occupy the same impregnable position as parties to a contract, which was conceded to the trustees of Dartmouth College, and that their rights under the original charter are equally protected by the constitution.   There is, in our opinion, nothing in the character or the rights of Louisville, as a municipal corporation, and as the founder or endower of the university, nothing in the manner in which its charter was obtained, or in its objects or the purposes for which it was enacted, nothing in the relation of the trustees of the university as a corporation, either to the city of Louisville or to the State of Kentucky, which should prevent them from having the full benefit of the obligations which the circumstances plainly indicate.   These circumstances, and the reciprocal obligations flowing from them, need not be recapitulated.   They present

City Louisville
vs.
Pres. & Trus.
University.
all the essential elements of a contract : competent
parties, mutual and sufficient considerations, and re-
ciprocal acts and obligations, privileges granted in
perpetuity, with corresponding duties, property con-
veyed in faith of this grant, and the correlative duties
undertaken and partially performed, in consideration
of the privileges and of the property. And we con-
clude this general view of the subject by saying, in
the language of the Chief Justice, in the Dartmouth
College case, (4 *Wheaton*, 643-4) : "This is plainly a
contract to which the donors, the trustees and the
State (in that case the crown) were the original par-
ties. It is a contract made on a valuable considera-
tion. It is a contract for the security and disposition
of property. It is a contract, on the faith of which
real and personal estate has been conveyed to the
corporation. It is, then, a contract within the letter
of the constitution, and within its spirit, also ; un-
less," &c. We omit the condition because, upon
grave consideration, it was held not to create an ex-
ception, taking the case out of the prohibition con-
tained in the constitution. It is suggested by the
counsel for the original trustees that the State and the
trustees or corporation are alone parties to this con-
tract, and that it is a novelty, presented for the first
time in the case of the *Dartmouth College vs. Wood-
ward*, to regard the donors as parties. But there is
certainly a contract between the donors and the do-
nee. And as the donors parted with their property
under the inducements of the charter promising a
continuance of the corporation, the faith of the State
was pledged to them, and there seems to be ground
for assuming that there was a contract between them
and the State, of which the terms are evidenced by
the charter. Whether by the donation the entire
benefit of this obligation on the part of the State
vests in the donee, so that the State would be under
no remaining obligation to the donors, might become
a material question if the corporation were to pro-
cure or assent to a legislative act purporting to divert

the donation from its original purposes. In any view, of the case, however, such an act would, if effectual, impair the obligation of the contract between the donor and the donee, and would derive no force from the consent of the donee, though there were no subsisting contract between the donors and the State ; and for the same reason the consent of the donor would give no validity to a legislative act inconsistent with his obligations to the donee growing out of the contract of donation, though there were no contract between the State and the donee. But denying the form or changing the description of the contract as stated in the quotation just made, which in terms refers to the original parties, it would at least seem to be just that the donors should have a right to insist that as long as their donation is retained, it shall not, even under the authority of the State, be diverted from the uses stipulated in the charter, and that this right should be transmissible, as incident to the reversionary interest, and to the contract of donation. In applying to the solution of the question presented in this case, the principles settled with respect to the charter of the Dartmouth College, and other similar corporations endowed by individual donors, we have not departed from what we regard as the true intent and meaning of the proposition insisted on as presenting the just and authoritative rule for discriminating between public and private corporations ; unless it be in assuming that a public municipal corporation may acquire property which, with respect to the State and its legislative power, is private, and entitled to the immunity of individual property. And this assumption, as we think, is not inconsistent with the proposition itself, nor excluded by it. Nor is our conclusion that this charter is, in its essential features, inviolable without the consent of the corporation established by it, inconsistent with the relation between the State and the city of Louisville as a municipal corporation. We have already seen that that relation did not make the property of Louisville the property of

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.
the State, nor subject it or its uses to the unrestrained power of the State. And it remains only to add, on this subject, that although the city council of Louisville is authorized to fill vacancies occurring in the body of trustees of the university, yet as the incorporation of the university may keep up its own organization, it is not dependent for its perpetuity, or for any of its faculties or capacities, upon the exercise of this function by the city. Doubtless the prosperity of the university is intimately connected with that of the city of Louisville, and perhaps dependent upon it. But neither its legal character nor its rights are, and perhaps even its prosperity and usefulness may not be dependent upon the continued existence of the corporation of Louisville, and certainly they are not dependent upon the continued identity of its forms of action. The inviolability of the charter of the university does not involve the immutability even of that organ of the city government which is to fill vacancies in the body of trustees. Any probable or conceivable change in the constitution of that organ, could have no substantial effect upon the charter or the rights of the university, and could but incidentally and remotely, if at all, affect the acts or character of the corporation. And if it did more, it could at most only raise the question whether the city had not lost the right by being deprived of the organ through which it was to be exercised. The loss of this right by a change in the charter of the city, would, like her failure to exercise it, only confine it to the corporation of the university, and there being a provision for her failure, whether voluntary or by negligence, and however long continued, we suppose, then, a deprivation of the right by a change of the city charter could not be regarded as a violation of the charter of the university. But we need not speculate upon cases which are scarcely within the range of possibility. The question here is not upon the power of the Legislature over the corporation of Louisville, or upon the indirect consequences on the charter or cor-

City Louisville
vs.
Pres. & Trus.
University.

poration of the university of any actual exercise of that power; but upon the validity of an act which takes away the property that had been given to the original trustees, and vests it in a new and different corporation, or of an act which, if there be any thread of continuity by which the original corporation can be regarded as identified with the new one, changes its constitution and organization in every essential particular. It may not be a fair topic of argument, but it is certainly one of commendation, that the Legislature has required that before the original trustees shall be deprived of the property which had been vested in them by valid gift and conveyance, the validity of the act which purports to authorize the transfer, shall be formally presented as a judicial question, and decided by the regularly constituted judicial tribunals of the State.

After the decision of the case of the *Dartmouth College vs. Woodward,* and of other cases with respect to charitable corporations in which that decision has been followed by the courts of different States, this would not have been a serious question but for the circumstance that the university was chartered at the request of the city of Louisville, and to receive as its principal endowment the donation which was afterwards made by that city. To this circumstance, and to the arguments founded upon it, and the inferences which it authorizes, we have given that earnest consideration which the importance of the question demands. The result of our reflections and investigations have been stated, and although they may disappoint the present wishes of the city of Louisville or of those who are acting for her, they confirm the objects and wishes of those who procured the charter of the university and made the donation to it. And if they have the effect of marring the symmetry of the intended system of education of which the university under its new organization was to constitute the centre, they do it by placing the rights of Louisville upon the only basis which can secure

City Louisville
vs.
Pres. & Trus.
University.

the permanence of any system which she may adopt on the faith of a charter granted by the State. The legislative power of the State is not dependent upon the will or the judgment of Louisville ; and the argument which would prove the university to be a public corporation and therefore subject to the unrestricted power of the Legislature, though in its present effects it may gratify her wishes, would in reality reduce her present and future, as well as her former will with respect to it, to insignificance. In placing the charter on the footing of a contract, we at least give effect to her will as demonstrated by the charter and by her donation under it. If this is fixing upon it a stability which is felt as a restraint, the State itself is, by the constitution, as well as every individual who makes a valid contract is by the law, subject to the same restraint. And if we arrive at our conclusions on this subject by regarding Louisville, though a municipal corporation, as occupying no higher ground than an individual, performing the same acts with respect to the university and its charter, would occupy, this, instead of degrading her or subjecting her interests to those of an inferior corporation, is placing her on the ground of safety, on the ground on which, in her transactions with others, she is placed by the law, and on which her rights are secured by the law and the constitution. What higher position could she desire or could equal laws concede to her in her relations with individuals or corporations, not subject to her will, than to be placed on a footing of equality with citizens subject to the same laws? That the university was not subjected to her mutable will is evidenced by the charter. That its subjection to the annual will of her citizens was not deemed, either by the Legislature or by the city of that date, wise or prudent or advantageous to the interests which it was to subserve, is proved by the charter and by the donation under it; and it cannot now be thus subjected, because its charter as a law is binding upon the city, and as a contract is binding

both upon the city and the State, and cannot be changed by their joint or separate action without the consent of the corporation itself.

If it be material to designate more particularly than has been already done, the character of this corporation, we say it is private because it is not the instrument or agent of the government, created to exercise any of its powers, nor entrusted with its property or with the conduct of its affairs, and because it was endowed with the private property of Louisville and others; and we suppose it is eleemosynary, because it was created and endowed for the promotion of education, and because its endowment with lots, buildings, library, apparatus, and other necessary accommodations, reduces the cost of instruction to the students generally or enables the institution to educate gratuitously a certain number; and to this extent it is eleemosynary. And although it be true that the donation by Louisville was prompted mainly by a view to her own aggrandizement and that of her citizens, it was still a charity, because it was given upon no other consideration required from the donee, but the promotion of education, which the law characterizes as a charitable object. (See *Statute of Charitable Uses,* 43 *Eliz.*; *Statute Laws of Ky. page* 308.) A gift to a corporation created for charitable purposes the law regards as a charity, and its legal character is not affected by the particular motives which may have induced it or the incidental advantages which may be derived or expected from it. Whatever may have been the actual motives of the donation, literary and professional education were the objects of the charter. And though the immediate gain to be expected from the aggregation of professors and students may have stimulated the charity of Louisville, it did not limit the education to be imparted, and could not confine its ultimate benefits to her own citizens or to her own territory.

The material question, however, is, whether this corporation stands upon the stable basis of a contract

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.

protected by the constitution of the United States, or whether it is a public corporation subject to the unrestrained legislation of the State? We have upon this question subjected it to the tests furnished by the case of the *Dartmouth College vs. Woodward*, according to our understanding of the principles of that case, though there are other cases more directly favorable to the conclusions which we have adopted. In the case of the *University of Maryland vs. Williams*, 9 *Gill & Johnson*, 307, it is said that the officers of public corporations are public officers, and that such corporations are created for political purposes. Other cases to the same effect might be referred to. It is sufficient, however, to say that the principles and conclusions of this opinion are sustained, not only by the two cases just named, but also by that of *Norris vs. Trustees of Abingdon Academy*, 7 *Gill & Johnson*, 7; *Fuller vs. Plainfield Academy*, 6 *Conn. Rep.* 544; *Allen vs. McKean*, 1 *Sumner*; *Trustees of New Gloucester vs. Bradbury*, 2 *Fairfield*, 118; and *the Inhabitants of Yarmouth vs. Trustees of School Fund in North Yarmouth*, (*Maine*,) reported in the August number of 1853 of the *Amrican Law Journal, page* 596.

The case of the *Alabama University vs. Winston*, of which we have only seen a short statement in 1 *U. S. Digest, title corporation*, seems to have been one in which the State had not only endowed the corporation which was decided to be public, but actually paid the trustees for attending to its affairs. So far, therefore, is that case from contravening either our own conclusions with respect to the University of Louisville, or the principles of the case of the Dartmouth College, as we have expounded them, that as the funds of the corporation belonged wholly to the State, as it was clearly but an instrument or agent for administering the property of the State in the fulfillment of a duty actually assumed by the State, it was, according to the opinion of Chief Justice Marshall, as understood by us, a public corporation, and subject to the unrestricted power of the State. The Legisla-

ture, upon admitted principles, had full power over the property, and over the organization which it had created for its management in discharge of a governmental duty. We can but refer on this part of the subject to a passage of the opinion of the Chief Justice, (4 *Wheaton, page* 630,) in which, by way of illustrating his idea of the assumption of the duty of education by the government, he describes a corporation created for that purpose, which would, according to the criterion furnished by himself, be subject to the unrestrained power of the Legislature. But that supposed corporation, like the University of Alabama, is widely different from the corporation now sought to be subjected to similar power. The cases cited from the legislation of this State, with respect to county academies, and the property which the State had given to them for the promotion of education, stand substantially on the same ground with the Alabama case, of the State disposing of its own. And as to the corporations and the gifts revoked and changed for the benefit of the University of Louisville, it is enough to say, without detail, that no right or claim of right is asserted in opposition to any of these measures. And they may be presumed to have been adopted with the general consent of all concerned. The university was an object of general interest, and was doubtless deemed of more importance by those concerned than any of the minor institutions whose place or endowments it was to take. We have met with no adjudged case inconsistent with the general positions which we have advanced; none which establish or intimate a distinction founded on the fact that a municipal corporation is the founder or endower of the charitable corporation, but have referred to several which disregard such a distinction. And whatever reason there might be for subjecting to the will or judgment of the municipality, a corporation created exclusively for municipal purposes, and as a mere instrument for the performance of municipal duties, it applies with but

City Louisville
vs.
Pres. & Trus.
University.
little force, if at all, to a corporation created for general as well as local purposes, and certainly cannot justify the implication of a power not provided for in the charter and inconsistent with it.

We are of opinion, therefore, upon the ground of authority as well as of reason, that the original charter of the University of Louisville creates a private corporation, which is protected by that clause of the constitution of the United States which prohibits the enactment of laws impairing the obligation of contracts; and that so much of the amended charter of the city of Louisville, of 1851, as relates to the pre-existing corporation and charter of the university, and vests or professes to vest in a new corporation or in new trustees the property and privileges of the original corporation, is in violation of that constitutional prohibition, and consequently void.

Wherefore, the judgment is affirmed by the concurrence of a majority of the court. Judge Hise will present his views in a dissenting opinion.

Judge Hise's dissent to the foregoing opinion—

On the 27th of June, 1851, the city of Louisville instituted suit in the Jefferson Circuit Court, by petition, against the president and trustees of the University of Louisville, for the purpose of recovering the possession of the university square in the city, the buildings erected thereupon, the property, funds and archives of the university, in order that the government, control, and management thereof should be placed in the hands of the "Board of Trustees of the University and Public Schools of Louisville," as elected and appointed in pursuance of the provisions of the tenth article of the present city charter, approved March 24, 1851. This proceeding was instituted in conformity with, and by authority of the tenth section of the thirteenth article of the said act chartering the city of Louisville, which provides, in substance, that by such proceeding the question of the constitutional validity of those provisions of the city charter, under and by virtue

Judge Hise's
dissent.

City Louisville
vs.
Pres. & Trus.
University.

of which the city of Louisville, as plaintiff, demands for the new board of trustees the possession and government of the university, including the medical department thereof, may be brought before and determined by the judge of the Jefferson Circuit Court, and by which either the city or the university may, if not satisfied with the decision of the circuit judge, prosecute an appeal or writ of error to this court.

Upon the pleadings, exhibits, proofs, and facts agreed, the circuit judge determined that so much of the act providing a new charter for the city of Louisville, approved March 24, 1851, as provides for the appointment of the "Board of Trustees of the University and Public Schools of Louisville," and directs that the possession and control of the university shall be delivered to them, and which virtually supersedes and removes from office the trustees, (defendants,) who were appointed according to the provisions of the charter of the University, was unconstitutional and void, and thereupon the petition of the city was dismissed, and the title to the property in controversy was "vested and quieted in the defendants."

The city, not content with the decision of the circuit judge, has, by writ of error, brought the case before this court; upon which the responsible duty is imposed, therefore, of determining finally the grave and important constitutional question presented by this record.

The important and interesting questions involved arise upon the following state of case:

By an act of the Legislature, approved February 2, 1833, Wm. C. Galt and eight others, by name, citizens of Louisville, were incorporated for the purpose of promoting medical science in the city of Louisville, with the corporate name and style of "The Medical Institute of the city of Louisville." The charter confers upon the persons incorporated, and their successors in office, the ordinary privileges and duties usually appertaining to corporate institutions of like character. The nine persons named in the

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.
charter are created and appointed therein as its officers, under the names of President, Moderator and Managers; and they have the right to admit additional members, and to provide for the election of their successors in office by their own by-laws. It does not appear, at the time this institution was chartered, or for several years afterwards, that it had received from private individuals, or from the city of Louisville, or from the State, any endowment whatever, or that there was any special founder who applied for the act of incorporation upon an undertaking then, or upon any promise in future, to endow the corporation, or to confer upon it any estate, real or personal, funds or revenues for its maintenance and support, as a civil corporation or as a charitable institution. It had, however, the right "to acquire, hold and enjoy all such real and personal property as might be necessary for the accommodation of the institute, and the advancement of medical science, and to dispose of it at pleasure," provided the income arising from such estate should not exceed $50,000 per annum. This institution continued in existence and operation, without endowment or property of any kind, so far as it appears, and consequently without any income or revenue, except such as was received from the students and paid by them for medical instruction, and for matriculation fees, &c. The charter provides that the original corporators, and such other persons as they might admit as members of the institute, should appoint the successors of the original officers named and selected in the said charter. It further provides, that the medical department of the Louisville marine hospital, and of the poor-house and city hospital, may be confided to the institute, the former by the trustees thereof, and the latter by the city authorities. (See *Sess. Acts*, 1832, 300.)

By an act of the Legislature, approved January 17, 1840, an institution of learning called the Louisville College, which had been previously established by the city of Louisville within its limits, and en

dowed and regulated by the city, by authority of the city charter, was, at the instance and by the request of Louisville, incorporated and chartered, to place this college "upon a more permanent foundation:" This charter provides: 1. That the trustees of the college should be *appointed* and removed at the pleasure of the mayor and council of the city of Louisville.

2. That the trustees shall conduct the affairs of the college, and manage and control the corporation under the corporate name and style of the Louisville College; and the usual rights, qualities, and powers of a corporation are conferred.

3. That the city of Louisville may take and hold, and the college may take and hold for the benefit of the institution, real and personal estate, the income from which not to exceed $10,000, to be applied for the establishment of libraries, cabinets of curiosities, and scholarships and professorships in the college.

4. The city of Louisville, as the founder of this institution, is vested by the charter, with full visitorial power over its affairs, and with the right to prescribe all the rules and regulations for its government and for the government of its fiscal and prudential concerns.

5. The power is reserved to the Legislature to amend, modify, or to repeal the charter; in the event of repeal, the property to revert to the donors or their heirs.

Such are the provisions of the charter of the Louisville College, found in Session Acts, 1839–'40, on page 51–2.

This college, it appears, was manifestly a public institution, created and established by the city of Louisville as a public municipal corporation, for a public political purpose—the diffusion of education; it was endowed by, and was completely under the government of the city, and when incorporated, it was with the same endowment, with the same public object, and remained still under the same control and

City Louisville
vs.
Pres. & Trus.
University.

government of the city, and was, to all intents and purposes a public or civil corporation, and as such, its charter, though such power had not been expressly reserved, was subject, with the consent of the city of Louisville, to be altered, amended, or repealed by the legislative power of the State, which extends to and over the subject of public instruction within the limits of this commonwealth.

On the 30th of March, 1837, more than four years after the Medical Institute of the city of Louisville was chartered, and after general and full notice thereof in the city newspapers, a large meeting of the citizens of Louisville was held at the Radical M. E. Church in the city, which organized in the usual form, by the appointment of Levi Tyler as chairman, and W. Tannehill as secretary, by which meeting the following resolutions were adopted unanimously :

"1. That there ought to be a college in the city of Louisville, with both *medical and law departments* attached.

"2. That the public square in the city, bounded by Eighth, Ninth, Chestnut and Magazine streets, should be set apart for the location of such college thereon.

"3. That said square was large enough for the erection of buildings thereon for a college proper, and for both the law and medical departments thereof.

"4. That the mayor and council of the city would act in conformity with the public sentiment of the citizens, by donating said square for the erection of said buildings.

"5. That the establishment of a college with medical and law departments attached would be alike *beneficial and advantageous* to all the citizens of Louisville, in *proportion* to their *property* and *business*, and ought to be a general charge on all.

"6. That it was highly expedient and proper that the medical department of such college should be immediately established, with a sufficient *endowment*, *on the part of the city* of Louisville, to afford means of

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

medical instruction equal to any other college in the United States, and that therefore the mayor and council of the city are requested to designate and donate said square for said college, and to have erected upon it the necessary and proper buildings for the *medical department* of said college, and also to purchase a suitable library, apparatus, &c., for the use of the said department, at the expense of the city of Louisville, and that the said medical department be placed under the control and management of the trustees of the Medical Institute of Louisville.

"7. That these resolutions be published in the city papers, and that they be laid before the mayor and council of the city, for their action thereon."

These public resolutions, signed by the chairman and secretary of the meeting, were accordingly presented to and laid before the next ensuing regular meeting of the mayor and board of councilmen of the city of Louisville, held on the third of April, 1837, by Levi Tyler, the chairman of said public meeting, and thereupon, upon the motion of James Guthrie, a member of the council, the following resolutions were adopted by the board of councilmen:

"1. That, in accordance with the resolutions of the citizens, of the 30th March, 1837, adopted at the Radical Church, (then before the council,) the square bounded by Chestnut, Magazine, Eighth and Ninth streets shall be given as a college square, and that the city of Louisville will undertake to build on said square the necessary buildings for a medical college, at a cost not exceeding $30,000, and that the city will advance in cash, for the purpose of purchasing a library, anatomical museum, and the requisite apparatus, &c., for the use of a medical school, the sum of $20,000, and that the control and management of the school be placed under the direction of the president and managers of the Medical Institute of Louisville.

"2. That the finance committee of the board cause a conveyance of said square to be prepared,

City Louisville
vs.
Pres. & Trus.
University.

stipulating for the erection of the buildings contemplated, for a medical school and other college edifices, and providing therein that, upon the future obtention of a charter for a college or university, the said square, buildings, library, museum, apparatus, &c., should, with the consent of the city, be conveyed to the trustees of such college or university, and providing that if the said square, building, property, library, &c., should cease to be used for a medical school, the whole should revert back to and re-vest in the city of Louisville, and be for the city benefit.

"3. That the Finance committee consider the ways and means of raising $20,000 for the purchase of the library, apparatus, &c."

In pursuance of the resolutions thus adopted by the citizens, and approved by the city authorities of Louisville, on the 21st of November, 1837, a deed was prepared and executed by the city as grantors, to the president and trustees of the Medical Institute of Louisville as grantees. In this deed the said resolutions adopted by the city council are recited at length as showing the design and purpose of the grant, and the institute agrees to accept the property upon the terms stated in the resolutions of the citizens as approved and adopted by the resolutions of the city council; and by this deed the square of ground between Eighth, and Ninth, Chestnut, and Magazine streets is conveyed, in consideration of the premises, to said grantees and to their successors, upon the following trusts and conditions :

1. The institute to have and to hold the property for the uses and purposes and upon the terms and conditions stated in said resolutions.

2. The city to have erected within the years 1838 and 1839 the necessary buildings for a medical college, at a cost not exceeding $30,000.

3. The city to have the right at any time thereafter to have erected other college edifices on the said square, and to alter, change, modify, enlarge or di-

minish such additional buildings and improvements at discretion.

4. At the request of the city, the grantees and their successors are bound to convey the said square and all the improvements thereon, and the library, apparatus, and other property conferred upon them by the city, to a college or university, if a charter should be thereafter obtained incorporating such college or university in the city.

5. That all the property, real and personal, thus conveyed by the city, and to be procured and donated by the city, for the establishment of the medical school, shall revert to and be vested in the city for her own use, whenever the same shall cease to be used for the purposes of a medical school.

Such are in substance the purposes set forth, and the trusts contained in this deed to the president and trustees of the Medical Institute of Louisville.

The city afterwards erected buildings upon the square conveyed, as stipulated in the deed, at a cost of about $30,000, for a medical college, and appropriated and applied about $20,000 to the purchase of a library, anatomical museum, &c., for its use.

Afterwards, by an act approved February 12, 1840, (*Session Acts*, 1839–40, *page* 173,) the charter of the Medical Institute of Louisville, by its consent, was so amended as in substance—

1. To abolish the office of moderators.

2. To give to the managers the right to appoint their own successors, and to fill all vacancies in the board, and to appoint their president and all the officers and agents of the institution, including professors, &c., and to remove them at pleasure.

3. To legalize the conveyance made by the city to the institute, and to confirm it according to its terms and conditions, and to authorize it to acquire other property and estate, so that its income shall not exceed $10,000 per annum, exclusive of the fees of the professors.

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.

4. To authorize the Legislature to amend, alter, or repeal the charter at pleasure, provided the estate and property of the institute, in the event the charter should be repealed, shall revert to the donors, grantors, or devisors, or their successors or heirs.

This institution under its charter, as thus amended by consent, continued in successful operation until 1846.

By an act of the Legislature, approved 7th of February, 1846, a charter was framed and adopted for the establishment of the University of Louisville by which—

1. Eleven persons named in the act are appointed trustees, and they and their successors are authorized to become a body politic and corporate in law, with the name and style of the "President and Trustees of the University of Louisville," and when organized are vested with those powers and charged with those duties which usually appertain to the managers of institutions of learning of like character. The university may acquire and hold real and personal estate sufficient to produce an annual income not exceeding $40,000, and the trustees may establish all such departments, faculties, professorships, lectureships, and tutorships as may be considered necessary for the promotion of every branch of science, literature, and the liberal arts, and alter or abolish the same at pleasure, and appoint a faculty, professors, lecturers, and tutors, and remove them at pleasure.

2. The president and trustees are to appoint all officers and agents of the institution, and have the management and control of its concers, and may confer all such degrees and exercise all such powers as appertain to a university of the highest order.

3. The trustees have authority to select and appoint one of themselves as president, and remove him at pleasure. The ten named trustees remaining, after the appointment of one of their number as president, are to divide themselves into five classes, two in each class: the first class to go out of office

City Louisville
vs.
Pres. & Trus.
University.

on.March 1, 1848; the second on March 1, 1850; the third on March 1, 1852; the fourth on March 1, 1854; and the fifth class on March 1, 1856.

The power and authority to appoint the successors to the first set of trustees, as their terms of office shall respectively expire, is vested in the *public authorities*, to-wit: the *mayor and council of the city of Louisville*, and the trustees so appointed by the city to hold their office for ten years. The city also has authority to fill all vacancies in the board, occurring from any cause whatever.

4. The president and trustees are required to make annual reports to the public authorities of the city of Louisville, showing the condition of each of the departments of the university, and the condition of the buildings, library, apparatus, &c., thereto belonging, and the mayor and council have authority, at all times, of inquiring into the concerns and condition of the institution.

5. All endowments or donations thereafter made to any department or branch of said university, to be held by the trustees, in trust especially for the exclusive use of such department, &c., as may be designated in the grant, and all endowments or donations to the university, made generally and without specification, shall be applied to the use of the academical department thereof.

The act then, by way of preamble to the sixth section thereof, refers to the conveyance from the city to the Medical Institute of Louisville, of the university square, &c., as having been executed to carry out the wishes and purposes of the citizens as expressed in said deed, and in the resolutions adopted at the Radical Church, and reported to and approved by the public authorities of the city, and it refers also to the stipulations in the conveyance in respect to the contemplated establishment of a university, and the undertaking of the institute upon the request of the city, to surrender and convey all the property derived from the city to such contem-

CITY LOUISVILLE *vs.* PRES. & TRUS. UNIVERSITY.

plated university; wherefore it is provided by the sixth section of the charter—

6. That when the Medical Institute, by request of the city, shall have conveyed the square, buildings, library, apparatus, &c., as derived from the city by the deed dated November 21, 1837, to the president and trustees of the university, and to their successors, that then the charter of the institute shall stand repealed, and the said institute shall then be merged into and become the medical department of the University of Louisville, and be under the control of the president and trustees of said university; provided that neither the city authorities or trustees of the university shall ever appropriate the Medical College edifice or said square, or the library, museum, apparatus, &c., belonging thereto, to any other use or purpose than for the advancement of the medical department of the said university.

The 7th section repeals the charter of the Louisville College, as above referred to—the repeal thereof to take effect when this act should go into operation—and directs the proceeds of the past and future sales of the college or seminary lot, west of Eighth street, to be applied, under the supervision of the public authorities of the city, to the erection of buildings on the university square for the academical department of the university.

The 8th section provides that a majority of the trustees may appoint and remove the professors in either department of the university, at pleasure.

The 9th section provides that one class from the academical department, each year, may attend gratuitously a course of lectures on anatomy, physiology, and chemistry, and that one class of the law department may annually attend gratuitously a course of lectures on medical jurisprudence, and that each department, if required, and upon the recommendation of the mayor and council of the city, shall receive not exceeding six pupils without charge, who have been two years in the public schools of

the city, and shall upon examination be found qualified for admission into the university.

The 10th section provides that the act shall take effect on March 15, 1846. The power is not expressly reserved by the Legislature, to alter or repeal this charter. (*Sess. Acts*, 1845-'46, *page* 135.)

Such are, in substance, the provisions of the act incorporating the University of Louisville.

On the 20th of April, 1846, at a meeting held on that day, the mayor and council of the city of Louisville took under consideration the question of directing the Medical Institute to convey to the university, the said square and buildings, library, museum, and the other property and funds which the city had previously granted to said institute; and after amending, and then approving a deed, from the president and managers of the institute, to the trustees of the university, which had been prepared by the city attorney, it was

"*Resolved*, That the deed be spread upon the records of this council, and a copy thereof be presented by the mayor to the said president and managers of the institute, who are hereby requested to sign, seal, acknowledge, and deliver the same for record in the County Court clerk's office."

On the 24th of April, 1846, the president and managers of the Medical Institute, as required in the deed to them from the city, and in pursuance of the request of the city council, as expressed in their resolution of the 20th of April, executed a conveyance to the president and trustees of the University of Louisville of all the property, funds, &c., derived from the city; which was acknowledged and recorded. In this deed the conveyance from the city to the institute, dated November 27, 1837, is referred to, and its terms, trusts, and conditions briefly stated. It is further stated therein that it was made in pursuance of the resolutions of the citizens, followed by those of the municipal council of the city of Louisville as heretofore referred to. That the trusts stipulated in

City Louisville
*vs.*
Pres. & Trus.
University.

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

the deed, and purposes indicated in those resolutions, were accepted and agreed to by the institute. That the college buildings had been erected by the city, and that the $20,000 had been advanced by the city as stipulated in the deed to them. That, with the exception of $1,211 33, the whole of the sum of $20,000 had been applied and expended in the purchase of a library, museum, and other apparatus; and then after reciting the various trusts and conditions upon which the institute received the estate from the city, and the fact of the obtention of a charter for the university, and the request of the city that the conveyance should be made to the university, the deed concludes as follows: "Now, in consideration of the premises," &c., "the parties of the first part have bargained, sold, and conveyed, and by these presents hereby bargains, sells and conveys to the parties of the second part, the said square, Medical College buildings, library, anatomical museum, apparatus, &c., belonging to the medical school of the parties of the first part, and said $1,211 33 : to have and to hold the same, to the parties of the second part, and their successors forever, upon the trusts under which the same was held by the parties of the first part, and in strict accordance with the charter of the parties of the second part, and for no other use, trust, or purpose whatever."

Two days after the date of this deed, to-wit, on the 26th of April, 1846, the president and trustees of the University of Louisville, through their secretary, present their first report to the mayor and council of the city, then being in session, in which they inform the council that they had organized themselves as a corporation, by electing a president and classifying themselves, as required by the 3d section of the charter; that they had received from the president and managers of the institute the conveyance of the college buildings, &c., and that they were in possession of all the property named in the conveyance, including the sum of $1,379 32, balance in cash on

hand belonging to said institute ; and proceed further to state what action they had taken, and what they had in contemplation, to add to the efficiency of the institution.

It appears that *after* the institute had been endowed by the city, and before and after the organization of the university, under its charter, some inconsiderable presents in books, &c., had been made by private persons, some to the institute and some to the university, amounting altogether in value to about $950. These small presents are considered as gratuitous additions to the endowments previously made by the city, both to the institute and the university.

The medical department of this university continued in successful operation from the time of its endowment and cotemporaneous organization in April, 1846, until the present controversy arose.

By an act approved March 24, 1851, the present charter of the city of Louisville was framed. The 1st section of article 10 of this city charter provides for the election, by the qualified voters in each of the wards of the city, of two qualified persons for each ward, and that the persons so elected shall constitute and be styled the "Board of Trustees of the University and Public Schools of Louisville." The first board elected are to be divided by lots into two classes: Those of the first classes to vacate their office in one year; the second in two years from the day of their election, and annually, thereafter, the voters of each ward in the city shall elect one person as trustee of the university and public schools of Louisville, to serve for two years and no longer.

The 2d section provides that the control and management of the university, of the high school for females, and of the public schools of Louisville, and of all the property and funds belonging to them, and which may accrue to them, in any way, for their establishment, management, and maintenance, under the provisions of the city charter, or otherwise, shall be vested in the said board of trustees, subject to the pro-

visions of the city charter, and the ordinances of the general council.

The 3d, 4th, 5th, and 6th sections of the 10th article prescribe the general powers and duties of the said board of trustees, in respect to the government and management of the entire university, and the general educational system in the city of Louisville, as provided for by the city charter. These powers and duties are similar to and not inconsistent with those conferred and imposed upon the trustees by the charter of the university.

In the 6th section it is further provided that when two years shall have elapsed after the *academical department* of the university *and the female high school* has been opened for the reception of pupils, none shall be received or admitted therein as pupils, except such as have attended for at least one scholastic year in some of the public schools of Louisville, and such others, of prescribed age and proficiency in learning, as have been raised and educated at the orphan asylums, or at other charitable institutions in the city.

It further provides that no fees shall ever be charged for tuition in the said *academical department* of the university, or in the high school for females.

The seventh section requires that the board of trustees shall annually, and oftener if required by the general council of the city, report in writing to the council the action, progress, and affairs of the university and public schools, and the condition of their property, funds, &c.; and report such other matters as may be required from time to time by the council.

The eighth, ninth, and tenth sections charge the general council of the city with the duty and power to procure, by taxes and loans, &c., and to apply ample and sufficient funds for the support and maintenance of the whole system of public education in the city as provided for in the charter, including the support of the University of Louisville, and all the pub-

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

lic schools, and for the erection of buildings for the *academical department* of the university, and for its support any endowment by the city; to erect school-houses in each ward of the city, and to erect buildings for a female high school, and to support it; and

The fourteenth section of the tenth article provides that, "the said board of trustees, and their successors in office, as provided for herein, shall take and hold the possession of all property and funds, set apart for the use of said university, for said high school for females, for the public schools of Louisville, and for educational purposes in the city. *But the university square*, and all *the property of the University of Louisville, shall be held to the uses and purposes set forth in the deed of donation, made by the mayor and council of said city to the president and trustees of the Medical Institute of Louisville, and in accordance with the resolutions adopted by the people of said city, in mass meeting at* the Radical Methodist Church, on the 20th day of October, 1837."

The tenth section of the thirteenth article provides that as preliminary to the right of the trustees, elected under the foregoing provisions to take possession of the university, its property, funds, &c, with a view to its management by them, their constitutional validity shall be tested and settled by the proceedings instituted in this case.

By the foregoing provisions of the city charter, the corporate existence of the University of Louisville has not been destroyed, its powers and duties have not been abridged, but rather enlarged, its property, resources, and funds have not been diminished, but provision ample is made for their increase; and the trusts, uses, and purposes for which the public endowment by the city government was made as limited in the deeds exhibited, have not been changed, diverted, or defeated, but on the contrary they have been expressly recognized, ratified, and confirmed by the 14th section of the 10th article of the city charter.

What has been done and effected then by the above provisions of the city charter, which is in violation of the constitution of the United States or of this commonwealth?

This question is answered by the counsel for the defendants by assuming, 1st. That the University of Louisville is a *private* institution or a *private* corporation; and 2nd. That consequently the original trustees appointed and incorporated by the university charter, and their successors appointed, as in the charter directed, by the mayor and council of the city, have taken and derived under the charter vested rights and franchises of which they cannot be deprived by either the local government of the city or that of the State, or by both combined, and that the said university charter is a contract between the original trustees and their successors, on the one part, and the commonwealth of Kentucky on the other, which cannot be altered by the Legislature as has been attempted without their consent; and that the immutability or inviolability of the charter is secured by the first clause of the tenth section of the constitution of the United States, and by the 18th section of the 10th article of the former, as well as by the 20th section of the 13th article of the present constitution of this State, each prohibiting the enactment of laws impairing the obligation of contracts.

On the other hand, it is assumed by the city, 1st. That the University of Louisville is a public corporation, created and designed exclusively as a political or civil institution, to be employed and used in the administration of the government for the promotion particularly and specially of the political and pecuniary interests of the local political community of Louisville, and generally of the interests of the State. 2nd. That the property and funds of the institution are public and not private, and were provided and set apart by the local community of Louisville, through her local government, and as a municipal corporation for the advancement of her public inter-

ests and for the benefit of her citizens, and not for the private advantage of the original trustees or their successors, and that the charter of the university was not such contract between the State or the city, and the defendants, the trustees, as can be, or was intended to be, protected and secured by the constitutional provisions of the State and the United States, to which reference has been made; but that the charter was contrived and procured to be enacted merely for the purpose of furnishing an organized machinery and instrumentality by which to accomplish public objects, by its administration for the time being in that form, of public property and funds appropriated by the city government for the advancement of *public* instruction and the interests of the citizens of Louisville.

If the University of Louisville, as incorporated by the act of February 7, 1846, is a private corporation, and if the charter is a contract with the original trustees and their successors, accepted and agreed to by them, and by which they have acquired vested rights for themselves or those whom they represent, of a private, not public nature, then it must be conceded that the Legislature had no power, without the consent of its founders, or of the parties to the contract, to change the number of the trustees, to abridge their term of office, to alter the mode of their appointment, or to authorise and direct the delivery of all the property and funds of the university, and to give up the entire management and control thereof, and of all the affairs and concerns of the institution, to the "Board of Trustees of the University and Public Schools of Louisville," elected by the qualified voters in the several wards of the city—all of which has been attempted to be done by the various provisions of the city charter above referred to—and in such case, if such be the character of the institution, those provisions of the city charter are unconstitutional and void, unless they be adopted, accepted, and agreed to by the real parties in the interest to this

City Louisville
*vs.*
Pres. & Trus.
University.

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

private corporate contract, if such it is admitted to
be.    But if, on the other hand, the University of Lou-
isville be a public corporation, civil or political in its
character and objects; if it has a public foundation;
if its funds and property be public and not private;
and if the trustees are mere public agents of the
government of the State or of the city, selected, by
authority of law, for the purpose of managing and
administering its funds and affairs, in such case those
provisions of the city charter, by which the posses-
sion, government, and control of the institution, and
its property and funds, is given to the new board of
trustees, are valid and binding:—because such cor-
porations are fully and completely subject to legis-
lative government and control, and their charters
may be amended, altered, and even repealed, at the
pleasure of the government, saving, however, any
private rights and interests of value which may have
vested, and, provided, by so doing, that the uses,
trusts, and rights arising from valid grants, shall not
be impaired or defeated. (See *Kent's Com.* 274 *and*
300; *Angel & Aimes on Corp.* 27–8; *McKim vs. Odone*,
3 *Bland (Md.) Ch'y Rep.* 417.)

In determing the true character of the corporation
of the University of Louisville, it is not necessary to
take into consideration the classes into which corpo-
rations are divided, as *sole* and *aggregate;* as ecclesi-
astical and lay.    There is no question but that the
University of Louisville is a lay corporation.    Lay
corporations are, however, subdivided into civil and
eleemosynary.    It is not deemed important, with a
view to the decision of the constitutional question
under consideration, whether the university of Louis-
ville be regarded as belonging to the one or the other
of those subdivisions, because there are both *public*
and *private civil* corporations; and so of those that are
eleemosynary, which may be either public or private,
as their foundation, purposes, and management may
be of a public or private nature.    Cities and towns
chartered and provided with subordinate local gov-

ernments, and counties clothed with a certain portion of governmental power and authority, are civil corporations, always public in their nature and attributes, because they are instruments employed by the sovereign power of the State to aid in the administration of civil government within certain limits: so, also, institutions created and chartered for banking purposes; for the construction of highways and public improvements, for the purpose of carrying out a system of public instruction; for manufacturing purposes, to manufacture the materials necessary for the government to use in time of war for the defense of the country, &c., are civil corporations, and must be classed as either public or private in their nature, according to their character, objects and foundation. All corporations are artificial bodies, having no natural or legal existence until created and incorporated by the sovereign power, and when created, their character as public or private, can and should be tested by the following simple rule: If they are created by the State, to carry out a legitimate system of public policy through their instrumentality, and upon a foundation or endowment, in the beginning, wholly provided by the government, such corporations are public in their nature, and so remain, although liberal and charitable individuals may subsequently contribute their private funds for their better support, and their charters may be altered, amended, or totally repealed by the government at its pleasure. If, however, a charter is passed by the State, in order that a company of private citizens under its provisions may be organized into a corporation founded upon their private funds and capital, and its corporate functions, privileges, and capital, are to be used for the private gain and profit of the contributors to its capital and funds, or for purposes of charity, merely, such corporation is private, and its charter possesses the character and attributes of a contract between the government and its founders or stockholders. It is under the protection of the constitutional provisions above

City Louisville
vs.
Pres. & Trus.
University.

referred to, and cannot be repealed, or changed, or altered by the government so as to impair it, in any degree, unless with their assent, or that of the real party contracting with the State.

If the University of Louisville had received its *endowment* from the *State of Kentucky*, then inasmuch as the State would, as a political sovereign, have both created the institution, and endowed it with the property and funds, in the first instance provided for its support, and as the purpose of its creation was, undoubtedly, to promote a system of public education, which is a matter of public and governmental concern, duty, and power, in such case, as the State would have been both the incipient and perficient founder of the institution, there would have been no difficulty, upon the application of the rule as above defined, in determining that this university was a public corporation.

So on the other hand if the State had upon the application of private citizens, as private contributors or subscribers of their own property or money, granted this charter to them to enable them to organize and support this institution for their private profit, or for charitable purposes, to enable them as philanthropists or patrons of the cause of learning, science, and education, to diffuse and furnish to the youth of the country gratuitous instruction: upon the application of the rule stated, it would be easy to ascertain the character of such corporation, and in such case it would necessarily be adjudged to be private, and as private not subject by alteration or amendment, to be impaired by Legislative interference, although the State itself might subsequently to its creation have furnished the largest contributions for its successful operation; for though it be the design or motive of the State in granting charters for the incorporation of companies, to promote the public interest and general welfare of the citizens, such design or motive would not of itself necessarily make the corporation public, inasmuch as a similar design

City Louisville
vs.
Pres. & Trus.
University.

and purpose may actuate the government in the creation of corporations whether they be public or private. But the University of Louisville, it would seem, though chartered by the State, and for important public or governmental purposes, to-wit: the diffusion of learning and the promotion of the pecuniary interests and the local prosperity of the citizens of the municipality of Louisville in particular, and of the general welfare of the people, yet it was not founded or endowed either by the State of Kentucky or by private citizens in their individual capacity, but by the city of Louisville as a public municipal corporation, or by the municipal government of the city exclusively in the first instance; and if this be a foundation or endowment of this university, which, in connection with the purpose of its creation would make it a public institution, it would so continue and remain to be public, although private individuals may have contributed subsequently, money or property to aid in the support, to facilitate its operations and to promote its success. As the corporation may be public or private in its origin, so it must remain, and its character cannot be subsequently changed from public to private or from private to public, because of subsequent contributions, whether made by the government or by individuals. If the corporation be public, private contributions, as blended with its public funds, become public, and are the public property of the corporation. If it be private, contributions by the State government, or by municipal governments within the State, become a part of the private property or funds of a private corporation, which the State has no power to sequestrate or to apply to public purposes, or to any other uses than those prescribed in the charter; nor can the charter be so altered as to impair the rights conferred, and the powers granted thereby, unless with the consent of the corporation. If then the University of Louisville be a public corporation, those provisions of the charter of the city which enlarge the numbers of

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

the trustees, shorten the term of their offices, transfer the right of their appointment from the city council to the majority of the qualified voters of the several wards of the city, and which provide for the delivery of the university square, buildings, property, and funds, and the control and management thereof, to the "board of trustees of the university and public schools of Louisville," are binding, valid, and constitutional. If, however, the university be a private corporation, then those provisions of the city charter are invalid and unconstitutional, unless enacted and adopted with the consent of both of the real and actual *parties in interest* to the contract, the terms of which are fixed and defined by the charter of the university itself. It is not deemed necessary to sustain the positions assumed in this opinion, to present an array of authorities composed of the decisions of the Supreme Court of the United States, and of the several States of the Union, inasmuch as they are manifestly supported by sound reason and a number of adjudged cases.

It is not controverted by the counsel who represent the university that the institution possesses two of the attributes of a public corporation, to-wit: 1. That it received its charter from the government of the State; and 2. That it was chartered for the *public purposes* indicated in the resolutions, (and especially the fifth of the series,) adopted by the citizens of Louisville at their public meeting, held at the Radical M. E. Church, on the 30th of March, 1837, as ratified and approved by the resolutions of the mayor and council of the city, adopted on the 3d of April, 1837, and as further indicated in the deed from the city to the Medical Institute of Louisville, made in pursuance of the said resolutions of the citizens and of the city council, dated 21st of November, 1837, and in the deed from the institute to the university, dated 24th of April, 1846. The purpose thus shown being manifestly to create a great university as the head and pinnacle of a splendid and munificent system of

public instruction, for the promotion of academical, legal, and medical learning, under the auspices of the public municipal authority and government of the city of Louisville, with a view to the prosperity and aggrandizement of that government, and of the inhabitants of that city. That such was the purpose of the creation of this university cannot be reasonably questioned. But it is insisted that notwithstanding it is thus characterized as a public institution, yet the university is a private corporation, because it was not endowed by the government which granted the charter; that its foundation was not provided by the Legislature of the State which granted the charter, but by the city of Louisville.

It is thus assumed that, although the city of Louisville be a public municipal corporation, itself the exclusive creature of the sovereign powers of the State, subject to have its political and governmental capacities increased or diminished, regulated or totally annihilated at the pleasure of the Legislature of the State; that although the property and funds constituting the exclusive original foundation of the university, belonged to the city as a municipal government, and as a public and political corporation; and although the charter of the university was expressly granted for the city, and at her instance, to receive the endowment previously provided, and the university as constituted was procured to be created to serve as a public instrument and political machine by which to promote a system of public education as a public enterprise for the promotion of the prosperity, grandeur, and wealth of the city, yet that because the *incipient founder*, the State, and the *perficient founder*, the city, were not the same identical political communities, and because the former was the government of the State, and the latter was the local and subordinate government of the municipality of the city of Louisville, therefore this university is a private corporation, and therefore the original board of trustees and their successors are parties to a pri-

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

vate contract, and clothed with rights, franchises, and powers that cannot be divested by the Legislature of the State, and that they are thus, in the government of this university, made wholly independent of the local government of Louisville, which provided its entire and actual original foundation, and of the government of the State, which furnished the charter for its organization.   This assumption is not admitted to be correct, and is not authorized by the weight of authority.   The celebrated case of the *Dartmouth College vs. Woodward*, reported in 4 *Wheaton*, 518 *to* 715, is not applicable, because the Dartmouth College was beyond controversy a private corporation, founded upon its first creation and organization by private benevolent persons—the Rev. E. Wheelock and others of Connecticut and New Hampshire, and the earl of Dartmouth and others of England.   The king of England granted the charter at the instance of the private contributors to its funds, and the State of New Hampshire was neither the incipient or perficient founder of the institution; and the question in that case was, whether, it being undoubtedly a private corporation, the government of the Dartmouth College could be taken from the trustees or their successors, regularly appointed under its charter, and the government, property, and funds of the institution transferred to other persons, otherwise appointed, and whether the constitution and government of the college could be radically changed by an act of the New Hampshire Legislature, against the consent of its founders or their representatives.   The court decide in that case that such act was in violation of the constitution of the United States, was null and void as an attempt to violate and impair the obligation of a private contract between the king of England and the individual founders of the college. The question did not arise, in the case referred to, as to whether a corporation like the University of Louisville, receiving its charter from the State government, and receiving its foundation from the munici-

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

pal government of the city of Louisville, a fractional part of the State government itself, is public or private in its nature, and consequently no such question was decided. But in that case a distinction is drawn between private and public corporations; and as public corporations are defined by Chief Justice Marshall, in the opinion of the court delivered by him, the University of Louisville is a public corporation, because it was chartered by the State, to receive a public foundation wholly furnished originally by the local public of the municipality of Louisville, in order to promote the public interests of the city. It is true that in the definition of the Chief Justice, whether the public endowment alluded to shall be made by the local or general public, or by the entire government of the State, or a fractional and subordinate part of that government, is not stated. But if the city of Louisville, as a subordinate local community, having political power and authority within prescribed limits, and within certain territorial extent, to assist thereby in promoting the purposes of the general government of the State, shall, with the public property belonging to the city government and with its public revenues, endow this university, its endowment and foundation is necessarily public; or, in the language used in the opinion referred to, "*the funds of the college are public property*" of the city of Louisville; the city, as a municipality or local government, "*is alone interested*," legally and politically, "*in its transactions*." Surely such foundation and endowment cannot be said to be private; for such assertion would be absurd, unless the private individual or individuals who furnished it could be named and pointed out. The funds and property of this university cannot be claimed as private. If so, to whom do they belong? who furnished them? to whom do they revert, upon a dissolution of the corporation, as original proprietors? No private person or number of private persons can be named as the perficient founders of this institution. But

CITY LOUISVILLE
    *vs.*
PRES. & TRUS.
UNIVERSITY.
the charter itself shows that the contemplated university, designed to be organized under its provisions, was, as preliminary to or as cotemporaneous with its organization, to receive its foundation and endowment from the local community and municipality of Louisville, out of the property and revenues belonging, not to the citizens of Louisville as private persons, but to the public political corporation of which they were members. This is evident from the sixth section of the charter of the university, and the preamble thereto, in which reference is made to the proceedings of the citizens at their public assemblage, and of the city council consequent thereupon; to the deed from the city to the institute; and to the stipulation therein, to the effect that the property and funds therein named should be afterwards conveyed by the institute to the contemplated university; and is further manifest from the seventh section of the said charter, which provides for a repeal of the charter of the Louisville College, a public institution of the municipality and under its absolute government and control, and for its being merged in the university, with the property belonging to it; and that the proceeds of the sale of the college property should, under the supervision of the *city authorities*, be applied to the construction of an edifice on the university square for the academical department of the university. The sixth section provides for the conveyance by the institute to the university of all the property and funds described in the deed from the city to the institute, at the city's request; that its charter shall be repealed, and it merged into the university, so as to constitute its medical department.

It is conceded that had this corporation been chartered by the legislature upon the application of private individuals, and to receive from them a private foundation, and that the corporation was thus organized and thus founded, in such case it would have been private in its character, and so have continued, although the city of Louisville as a local and subor-

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

dinate community, or the State itself may have sub-
sequently added ever so largely in property or money
to such private foundations.    But such are not the
facts of this case.  The institute, although at first in
form a private corporation, without any foundation
either public or private, received upon terms a pub-
lic endowment or foundation from the city, and con-
sented to an amendment of its charter by which, if
it did not actually become a public corporation itself,
it agreed to pass with the public endowment it
had, upon certain conditions and trusts, received from
the city, and to become merged into the University
of Louisville, whose charter was granted expressly to
authorize its organization, in order that it might then
receive such public endowment;—and the university
being in its origin, as built upon an exclusive public
foundation, a public corporation, its public character
cannot be changed even though additions may be
made to its foundation by private contributors, whose
contributions must be regarded as furnished to in-
crease and add to the public property and funds pro-
vided by the city for the support of the institution,
and cannot have the effect to change its nature from
public to private.   It is assumed in the opinion of
the Circuit Court, that although the city of Louis-
ville is a public municipal corporation, created as an
instrument of the government of the State, to assist
in governing a portion of its inhabitants within cer-
tain territorial bounds under special regulations, sub-
ject to the jurisdiction and under the absolute con-
trol and dominion of the State to be continued or de-
stroyed at pleasure ; and although the property and
revenues of the city are public in respect to the city
government, and the citizens and public authorities
of Louisville, yet in respect to the whole State they
are private, and therefore independent of Legislative
control, unless with the consent of the city government.
This position is untenable.   If the municipal functions
and government of the city are granted, and may be, at
discretion, withdrawn by the State, regardless of her

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.

consent; if the municipality of Louisville has been created by the State as a public machine and instrument to assist in the civil administration of its government; and if this instrument may be destroyed at the pleasure of the sovereign Legislative authority of the whole State; then, should the State exercise its undoubted power and authority for such purpose and repeal the charter of the city, and destroy the city government altogether, as an expensive and superfluous appendage to the other public institutions of the country, in such case what would become of the public revenues of the city remaining unexpended, and of its public property, real and personal, which had not been previously appropriated. Certainly neither the legal and equitable right would remain and continue to be vested directly or indirectly in the municipality which no longer existed, and which was* legally and constitutionally defunct. The inhabitants as a corporation could no longer lay claim to the public property and funds, because they had ceased to exist as such; nor could they as private individuals be entitled to a distribution of the same among them severally, because the fund being public it could only be applied to public purposes. If the supreme government chooses for its own convenience and purposes to use the instrumentality of subordinate and local public communities to assist in its administration, they may, as being completely under its jurisdiction, be discontinued and abolished at pleasure, and when abolished, all their public property and revenues not appropriated, and which have been acquired in the exercise of their subordinate powers and functions, would necessarily, with all those powers and functions, vest in, and return to the supreme government, upon which would rest merely the moral obligation and duty of applying in good faith those funds for the benefit and advantage of those of her citizens from whom they may have been principally collected by the local authorities. The city of Louisville, as an inferior local government,

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

under the authority and jurisdiction, and with the consent of the State, employs a portion of its public property and revenues for the support of a university as a matter of public policy, to promote her own aggrandizement, by the advantages to her citizens proceeding from a grand system of public education, of which this university was to be the main pillar. It follows that the university is a *public* corporation, because it was adopted and wholly endowed as a public agent with its public funds, by the city of Louisville, itself a *public* corporation, and public instrument and agent of the supreme government, and both the former and the latter public agents and instruments were created by the State, manifestly for political and governmental purposes.

The State creates a public agent a municipal corporation for public purposes with certain powers as an instrument of government within the limits of the city of Louisville. This public corporate agent of the State has authority from the State to endow with public property and revenues a public sub-agent, a chartered university, by means of which to carry out a system of public policy, in respect to education and the diffusion of learning under the public patronage.

It seems, therefore, that the sub-agent, the university, is as much an instrument of the supreme government as the principal agent, the municipality of Louisville, and that both are alike subject to legislative control as *public corporations*, always provided that by the exercise of such control there be no unauthorized interference with or violation of the vested rights of individuals or of private corporations.

The university of Louisville is assumed to be a public corporation, therefore, for the reasons stated, and which may be briefly recapitulatee, as follows:

1. Because its endowment was wholly provided and furnished by a public instrument and agent of the supreme government, to-wit: the public municipal corporation of the city of Louisville, which makes the said endowment public, as much so as if it had

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.
been furnished and provided by the State directly, instead of indirectly, through said public governmental agent.

2. It was created by the supreme government of the State as a subordinate public sub-agent; and

3. It was designed to assist in the administration of the government, in respect to the support and management of a plan of public instruction.

· 4. Not only was it founded by the local public of Louisville as a municipal corporation, but, more effectually to mark its public character, the city authorities appointed the trustees, filled all vacancies occurring in the board. The trustees were bound to make reports in writing, to the city council, annually or oftener, if required, of the action, progress, and condition of the institution, and of all such matters, in respect to its management, as might be required by the public authorities, who at all times had the power of examining its affairs and condition, as appears from the third and fourth sections of the charter.

The trustees of the university are therefore mere public employees, appointed without emolument or reward of any kind, to manage it as a public institution, until superceded either by a repeal of its charter or a change in its constitution, by which its management may be committed to other persons appointed by the State.

But suppose the position taken by the circuit judge to be correct—that because the university was endowed or founded by the local community of Louisville, and not directly by the Legislature of the State, that therefore, (although the city government is itself a mere political creature and agency of the State,) the university is a private corporation, and that its charter is in the nature of a contract between the government of the State and the government of the city as contracting parties, and hence irrepealable and unalterable except with the consent of the city; or, to use the language of the opinion of the circuit judge, that

the property of the city is "as essentially private pro-
perty as that owned by any of her citizens, and as
effectually protected from legislative interference
without her consent"—the answer then would be that
the city and her inhabitants have consented to the
amendments made in the charter of the university.
They were proposed by the city, and adopted by the
Legislature at her request, and ratified by the people
of the local community ; and the present proceeding
has been instituted by the city itself to recover in be-
half of its trustees appointed under those amend-
ments, the possession of the buildings, property and
funds composing the university.   Surely it cannot be
contended that the contract may not be radically
changed or totally rescinded by the contracting par-
ties themselves, and assuming the endowment by
Louisville to be private, furnished for a private insti-
tution, and for private purposes of gain and profit to
the city, or for charitable uses, then any change may
be made in the fundamental statutes of the institu-
tion, substituting one set of managers and overseers
for another, and providing a different mode for their
appointment ; provided the uses and trusts upon and
for which the corporation was endowed, be not de-
feated or destroyed, and provided both the incipient
and perficient founders consent to make such change,
and accept it when made.   If the university of Lou-
isville be a private corporation, and its charter be un-
alterable and irrepealable, on the ground of its being
a contract with a private party, whose vested rights
under such contract cannot be constitutionally im-
paired, or changed by the State, except with the con-
sent of such contracting party, then it is important to
know and determine who is this contracting party?
With whom did the State contract, when the charter
was issued and accepted, and the university organi-
zed and endowed ? Not with the eleven trustees who
first received their appointment as such in the charter
itself ; for they did not apply to the State for the char-
ter, nor did they promise or contemplate the endow-

City Louisville
vs.
Pres. & Trus.
University. ment, out of their private property or means, of the university, before its charter issued; nor did they endow it after it was organized under it.

The authorities of the city government, it is conceded, applied for and procured the passage of the charter, and doubtless the names of the eleven gentlemen mentioned in the charter as the original trustees were presented to the Legislature by the city with a request that they should be appointed by the charter, as the original trustees through whom to conveniently effect the organization of the institution, and under the charter they took no vested rights, in the corporation after its organization; they held no interest of value; they were mere naked trustees charged by the State and the city with the temporary management of the institution, after its organization was effected through their instrumentality, and until their successors should be appointed by the city council. No personal interest of value or vested personal right, was connected with the trusts confided to them for the time being; they received no compensation for their services, which were to be gratuitously rendered; they were under no obligations, legal or moral, to accept the trust; accepting it, they could resign it at pleasure, and it is not perceived how they can be regarded as having such vested right or interest in this corporation as that they may forbid the sovereign power of the State, with the consent of the founder of the university, the city of Louisville, to new model and change its government so as to throw its management in the hands of other trustees, at the same time leaving untouched the uses, and trusts, and purposes for the furtherance of which the funds and property were provided by said city. They were the mere agents of the State or city, or of both, with instructions and authority for certain specified purposes as prescribed in said charter, and surely the State and the city concurring, they may revoke such agency and appoint other agents at their discretion; therefore the eleven trus-

tees were not the corporation itself, but the mere agents first named and authorized to manage it under the supervision of the city authorities, and they have no such interest in the corporation as would justify them in the pretension that they are the actual contracting parties with the State, and as such, that they are the proper persons, on their own behalf, to complain that by the amendments to the charter, revoking their agency and placing the government of the university in other hands, their constitutional rights have been violated. What rights, and what interest of value in this charter contract, if it be such, have they? How can they be profited by keeping the constitution of the university unchanged so that the mode of appointment, and the number of trustees, or their term of office, may forever continue unaltered. How would they be benefitted by this? The terms of their offices would expire at the period limited at all events, and during their continuance in office they have labor, duty, and responsibility to perform and encounter, without emolument, unless, indeed, upon the unjustifiable supposition that the incumbents be corrupt and dishonest, and that they make their offices lucrative by receiving bribes for the appointment of incompetent and unworthy persons to the professorships in the institution, or by the embezzlement and appropriation of its funds to their private use. Whether this university be a public or private corporation, these trustees are the mere volunteer agents of the city of Louisville, allowed, until the revocation of their agency, to discharge the duties imposed on them by the charter; and the city, with the consent of the State, may at any time by law effect that revocation, and place the institution and its management under the subordinate control of other persons. No rights or interest of value could, under the charter, attach to the trustees, personally which could be injured or impaired by the amendments made to it; for none such did they acquire when they accepted the position of trustees,

CITY LOUISVILLE
.vs.
PRES. & TRUS.
UNIVERSITY.

that through them the city might have her university organized, to receive the endowment from her, in fulfillment of this very purpose, as shown by the deed from the city to the Medical Institute; when their position as trustees should cease to exist necessarily by the limitation of their appointments as to time, or by the legal revocation of their appointments, in neither event would they retain a single vestige of interest or shadow of a right under this charter. The professors and other employees of the institution cannot be regarded as parties to this contract, if such it be, 1. Because they were unknown to the State, and had no official existence at all, when the charter was issued, or when it was accepted and the institution organized and endowed under it, and when such contract was consummated and the legal parties to it ascertained. 2. Because they are the mere servants and employees of the corporation for hire, subject to be appointed and removed by the trustees at pleasure. Even the professorships, tutorships, and subordinate employments themselves may be multiplied or discontinued, established or abolished by the existing trustees:—Therefore, when this assumed contract was proposed, accepted, and consummated, and the legal parties to it ascertained and fixed, the professorships, tutorships, and other employments in the university were not as yet established, nor were the professors, tutors, and other officers then chosen or known.

The students who receive their education in the institution cannot be regarded as having any legal or equitable interest under this corporate contract, if such it is, and cannot be parties to it, for the reasons given above, and because, further, they merely deal with and employ the corporation to furnish them instruction for compensation agreed to be given. They come and go continually, and have no further interest in the institution, after they have received the amount of instruction desired, and for which they have made remuneration. And the question again

arises, if this charter be a contract not to be altered or impaired except by consent of the contracting parties, who are they, or rather, who can they be, but the State, the incipient, and the municipality of Louisville, the perficient founder of the university, both of whom have consented to and accepted the amendments and alterations to this act of incorporation, as contained in the charter of the city; and if the principals have consented to these changes in their contract, the trustees, as the agents of one or both the parties, have no right to complain, because no contract of theirs has thereby been impaired, and their constitutional rights have not been infringed. If, under the operation of the amendments objected to, the trustees are required to surrender the trusts temporarily reposed in them, they are not injured, but thereby only exempted from the onerous and responsible duties of the station. The professors, tutors, &c., employed, have no right to complain; for if deprived of their situations, they are at liberty otherwise to employ their time and talents. The youth instructed in the institution may not complain, for if, under the constitution of the university, as amended, they or their parents and guardians choose to withdraw their patronage from it, they may do so, and receive instruction from and bestow their patronage on other institutions of learning, at their discretion.

In the Dartmouth College case, the trustees, the regular successors of those named in the charter, were plaintiffs in the action against W. H. Woodward, to recover the records, books, property, and funds of the institution; Woodward had been removed from his offices of secretary and treasurer of the college, and was appointed to the same offices by the new board of trustees, who had received their appointments, under the recent re-construction of the charter by the Legislature of New Hampshire. The defendant resisted the claim of the plaintiffs upon the ground that under the amended charter he was, as secretary and treasurer of the Dartmouth *University,*

City Louisville
vs.
Pres. & Trus.
University.

in rightful possession of the archives, property, and funds of the *college*, by authority from the new board of trustees and overseers. The validity of the acts of the New Hampshire Legislature, amending the charter, was the sole question involved. The Dartmouth College was rightfully adjudged to be a private corporation, and the amendatory acts of the Legislature, by which it was attempted to re-model the institution and radically change its government, and its governors, were pronounced to be unconstitutional, and judgment given for the plaintiffs.

The right of the trustees in that case to contest the validity of the amendments to the charter, and to maintain the action, was not based upon the ground that they had vested rights and interests of value in the institution which had been impaired, but, upon the ground that they were the proper plaintiffs in the case, and had authority to sue under the charter, and to recover, as the *representatives* and *trustees* of the *private founders* of the institution, their donations, so as to dispense their bounty and their charitable contributions through the instrumentality of a charity school, or an eleemosynary corporation, as Dartmouth College was, from the peculiar features of its charter, pronounced to be. What the opinion of the Supreme Court would have been in that case, had it appeared that all the private founders of the college had assented to and accepted the modifications of the charter made by the acts of the New Hampshire Legislature, cannot be known with certainty. It is certain, however, that as such was not the fact in that case, it bears no analogy to this, but differs materially in this; that in that case the founders of the institution, through the corporation as their representative and assignee, were complaining that their contract had been impaired and violated without their consent; and in the case under consideration, the original perficient founder consents to the alterations made in the contract, and demands that the institution, with its government as changed, shall be sur-

City Louisville
*vs.*
Pres. & Trus.
University.

rendered to a new set of agents and governors, selected in a mode agreed upon by both the contracting parties —the State and the city.   In the Dartmouth College case, from the provisions in the charter, and from the terms and trusts created in its foundation and endowment, it was adjudged to be a *charitable*, or an eleemosynary institution, created as an instrument to dispense the bounty of the donors, yet it is pronounced by Chief Justice Marshall to be "plainly a contract to which the donors, the trustees, and the crown were the original parties," the original trustees being, doubtless, themselves donors.   In the present case it is perfectly manifest, from the resolutions of the citizens in their public meetings, from the corresponding resolutions and action of the mayor and council of the city, from the recitals and trusts as contained in the deed from the city to the institute, and from the institute to the university, and from the whole scope and tenor of its charter, that the University of Louisville, if it be a private corporation, is not an eleemosynary or charitable institution, nor was it created or designed for charitable uses or purposes ; but it is indisputably evident that it is a civil institution, and that it was created and founded expressly to promote the interests of the public of Louisville, and to promote the growth, the wealth, and aggrandizement of that city.

A college or university, employing its funds and property in the business of carrying on a system of education for compensation and profit, or in procuring teachers, and selling instruction for gain, cannot be regarded as an eleemosynary institution, any more than banking, manufacturing, commercial, or mining corporations, who employ their capital to make gain and profit by trading in money, goods, minerals, &c.   And it does not follow that a chartered institution of learning is necessarily eleemosynary in its nature, but its character, whether civil or eleemosynary, depends upon the object and purpose of its creation, and the uses and purposes to which its

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

labor, funds, and property are to be applied under the provisions of its charter. Then if the Louisville University be a civil institution, and if by its charter it is manifest, as it is, that it was created by the State and wholly endowed, or in other words, its whole stock taken, and capital furnished by the city of Louisville, to promote the interest of her government and citizens, it follows that the city, as the actual and legal contracting party with the State, may consent that the Legislature of the State may amend its charter, and she has authority to accept such amendment when made, and the trustees or others may not complain of violated rights or breach of contract, if the city is content. It must be observed that the defendants, the present trustees, are mere agents having furnished no part of the stock, capital, or property upon which this university is founded; and notwithstanding this, these trustees are the parties defendants, who resist the demand of the city, (she having furnished everything,) to have her institution delivered to other agents or trustees selected by her under its amended constitution. Suppose, (as well may be the case, should the charter so provide,) that the president, directors, and officers of a banking or manufacturing corporation, named and appointed in its charter, should own no part of the capital stock, property, or funds of the corporation, but that they should have been selected by the intended stockholders, and named in the act of incorporation to manage the concern with or without compensation: would they have the right to hold on to the books, papers, funds, and property of the corporation against the demand of the stockholders made through a new body of officers appointed under an amended charter; and could such board, with any show of reason, or upon any sound legal principle, deny the right of the company to consent to have their own charter amended, and their privilege to accept and make effectual such amendment? These querries must receive a negative answer. Then

City Louisville
vs.
Pres. & Trus.
University.

the city of Louisville is the only stockholder in this chartered university; she contributed the whole original capital, not for charitable purposes, but for her own exclusive gain and profit, and she has an undoubted right, despite the opposition of the trustees, to accept the amendments to the charter, made at her instance, by the Legislature of the State.

The city of Louisville, as a municipal corporation, by authority from the State, may devote the public property and revenues of the city to promote a system of education, for her own benefit. Suppose, by her charter, she had general legislative power also to incorporate colleges and universities,- as instruments of the city to effect such views, within her local and subordinate jurisdiction; and in the exercise of such power, suppose the city council had both chartered and endowed the Louisville University to carry out a system of public policy for the city, in respect to education, could the trustees, in such case, claim that the charter was a contract between them and the city government, and that they, as the beneficiaries, could gainsay the authority of that government so to amend the charter, as to authorize the transfer of the university to other trustees of her own appointment? They could not; and if not, their right to set themselves up as parties to and beneficiaries under this charter contract cannot arise, or acquire validity, because it was granted by the State to the city, at her request, with the express design of receiving its foundation from her.

On behalf of the defendants it is first assumed that the university is a charitable institutiion; and then it is contended, that although, (as conceded in the opinion delivered by Chief Justice Marshall in the Dartmouth College case,) the trustees have no beneficial interest or vested personal rights under the charter, yet as the representatives or assignees of the donors or founders of the charity, (who do not appear to protect and defend their own right, to have their bounty dispensed according to their own de-

CITY LOUISVILLE
*vs.*
PRES. & TRUS.
UNIVERSITY.

sign,) they, the trustees, have the right to claim on behalf of their constituents the inviolability of their charter, and to protect it from legislative control, and a number of authorities are cited to sustain a position which is not controverted, and which cannot affect the present case, because the University of Louisville is not a charitable institution, or an eleemosynary corporation, and because in this case the founder, the city, *does appear*, and demands that the university, created at her instance, and the capital, property, and funds of which were furnished by her, shall, under its modified charter, be surrendered up to the "Board of Trustees of the University and Public Schools of Louisville," lately appointed according to the tenth article of the city charter.

On behalf of defendants it is assumed that the city of Louisville has no beneficial interest whatever in the university, either legal or equitable, and that the cause of education generally, and of medical education in particular, are the only beneficiaries, and that they are not complaining, and are not parties to this proceeding, except as represented by the defendants; that the city has, by the deeds to the institute and to the university, made valid grants of her property for the benefit of education, and she occupies no longer the attitude of holder of the legal title, nor that of *cestui que trust* under the grants; and this is contended for, in the face of the resolutions of the citizens, and of the city council, and of the very purposes and objects of the appropriation of the property and revenues of the city, as distinctly defined and set forth in the deeds referred to. The correctness of this view is not perceived. On the contrary, the city should be regarded as having, by those deeds, and in that form, made an investment of her property and capital in this institution for her own exclusive benefit; not for the cause of education merely, except so far as its advancement would tend to promote her political and pecuniary interests. She invests her property and funds that they may be em-

ployed through this organized channel to produce a
great resort to the city, of students of law, of medi-
cine, and of the arts and sciences generally, there to
spend their money for instruction, and for the neces-
saries and luxuries of life, and thus to increase the
population and wealth of the community of Louis-
ville.   And the amendments to the charter of the
university were asked for and accepted by the party
who furnished the whole capital stock of the concern,
for her own exclusive benefit, and from no motives of
charity, and for no mere charitable purpose whatever.

Incorporated institutions may be, and are often es-
tablished and founded upon private capital, and
owned by private persons, to make profit by furnish-
ing education to the youth of the country for full
compensation, by furnishing medicine, medical at-
tendance, and advice, together with board and main-
tenance to the sick, for adequate compensation; or
by receiving, supporting, and treating medicinally,
maniacs, lunatics, and insane persons for pay.   These
institutions are called colleges, hospitals, asylums,
infirmaries, and the like; yet neither their names
nor the business in which they may be engaged,
would necessarily make them charitable institutions
or eleemosynary corporations, though they be private.
They may be and frequently are mere money making
contrivances of those furnishing the capital upon
which they are founded, to derive gain, by the sale
of education, board, and maintenance, and medical
assistance, &c.   So with respect to the University of
Louisville; if it is a private corporation, then it is
obvious that Louisville is the private owner of it, as
she furnished the whole capital on which it was
founded, to promote her own interest by the sale of
education; and the trustees or managers of all such
institutions are the mere agents of the founders; and
if they have themselves furnished no part of the cap-
ital, and have no personal interest whatever, they
have no legal ground of objection to the action of the
real beneficiaries, in procuring amendments to their

City Louisville
*vs.*
Pres. & Trus.
University.
charter, by which other trustees may be selected to govern their institution.

Corporate colleges, hospitals, asylums, &c., therefore may or may not be charitable institutions ; and whether they be so or not is to be collected from the provision of their several charters, and the terms upon which their funds and property may have been furnished for their foundation. If they are private and eleemosynary in their character, then it is granted that the trustees represent the founders of the charity, and that as their assignees they may rightfully claim the protection of the institution as against legislative infractions of the charter. If they be not charitable institutions, but mere instruments by which to make gain and profit for the contributors of the capital, in such case they may have their charters altered and amended at their discretion, with or without the consent of their trustees, if they are not also contributors ; and as before remarked, and assumed, such corporate institutions may also be either *public* or *private*.

It is said in the opinion of the court in the Dartmouth college case, as follows: "That education is an object of national concern, and a proper subject of legislation, all admit. That there may be an institution founded by government, and placed entirely under its immediate control, the officers of which would be public officers, amenable exclusively to government, none will deny."

Now it would seem that to class the Louisville University as a public corporation is a matter of necessity and that it cannot be otherwise classed, reasonably, because its business to educate youth is one of "*public concern;*" the *local public* of *Louisville* got it up, and furnished its whole endowment or capital; it was chartered and endowed to promote the exclusive interest of the *public community* of Louisville, and it was chartered by the general *public* of the State, to assist the suborate *public* authorities of Louisville in the administration of the *public local government* of

the city, in respect to carrying on a system of *public* instruction under the general supervision of the *public* officers of the city, and it does not seem to possess any of the real features or characteristics of a private corporation or charitable institution.

The case of the *Trustees of New Gloucester vs. Bradbury*, 2 *Fairfield*, (*M. R.*) 118, and of *Allen vs. McKean*, 1 *Sumner's R.* 296, are mainly relied upon by defendants as authority in support of the assumption that the University of Louisville is a private corporation, and that its charter is not amendable or repealable by the State Legislature. In the former case, though very similar to this in many respects, yet it seems it was expressly provided in the charter of that institution "that it should never be in the power of the town to *alter* or alienate the appropriation of the fund." This was of course a condition upon which the incorporating act was passed. It seems, also, that in the act of separation of Maine from the State of Massachusetts it was provided that "all grants of lands, franchises, immunities, corporate or other rights, &c., which have been, or may be made by the said commonwealth before the separation, * * shall continue in force," &c.; and that this provision composed a part and was embodied in the constitution of the State of Maine. Therefore as the charter of the new Gloucester *educational institution*, granted by Massachusetts, was made inviolable by an express provision of the constitution of the State of Maine, the question as to its character, whether *public* or *private*, did not necessarily arise, and its decision was not required, to arrive to the determination that the laws amending that charter were unconstitutional. And it seems moreover that the court in that case took a very superficial and somewhat inaccurate view of the opinion of the Supreme Court in the Dartmouth College case, and of the principles therein decided.

In the case of *Allen vs. McKean*, 1 *Sumner*, 276, the Bowdoin College was pronounced to be a private corporation, although its funds had been derived gen-

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.
erally from the bounty of the government, upon the ground that it was *expressly chartered as a private institution* of charity, and being private, its nature could not be changed, so as to become public and be subject to public control, because it had received the patronage of the State, inasmuch as if private in its origin it must so continue; and it is not necessarily rendered *public* because it has received its corporate charter from the government. In the opinion last referred to, the two most material points are assumed as collected from the charter: 1. That the college was incorporated as a *private institution*, eleemosynary in its nature. 2. That the endowment by the government was a mere charitable and absolute donation. Neither of these points can be admitted to exist in this case. The University of Louisville was not expressly created as a private eleemosynary corporation, nor was the endowment made by the city of Louisville provided as a mere bounty for charitable purposes.

It may, perhaps, with propriety be admitted that a chartered institution of learning may have been created for the furtherance of objects of public concern, power and duty, and provided with public funds exclusively for its support, and yet at the same time it may be made private by the express provisions of its charter, and thus be exempt from the rule applicable to public corporations, and be placed beyond legislative control, because so expressly provided, and because the foundation, though given by the State, has been granted absolutely and without reserve or condition to the corporation to be managed and employed, not as a public but as a private fund. But if the charter be issued by the State, to create an institution for public purposes, and upon a foundation in the first instance exclusively provided by the State at large, or by any of its subordinate local public agents and instruments of government, such as municipal corporations, such institution surely would be subject

to the joint public control of the State that chartered and the municipality which founded it, (always saving private rights and vested interests.) unless otherwise expressly provided by the charter itself.

To give authority to alter or repeal the charter of a private company, it is necessary that the charter itself should so provide. On the other hand, if from its creation, purposes, and endowment, the corporation be public, it cannot have the inviolable sanctity belonging to those which are private, or be exempt from Legislative control, unless also by express provision of its charter such private sanctity is given to it, and such control is expressly renounced. The charter of the Louisville University contains no such provisions; the foundation is public and conditional; the property composing it to be employed according to the terms and trusts of the investment as contained in the articles of subscription, to-wit : the deeds to the institute and to the university, and the whole property to revert to the city in the event the university shall be discontinued.

The charter of the Bowdoin College was also placed on the footing of a private corporation, by the articles of separation between the States of Massachusetts and Maine, which as before observed, were incorporated into the constitution of the latter State, and which provided that "the president and trustees and the overseers of said college shall have, hold, and enjoy their powers and privileges in all respects, so that the same shall not be subject to be altered, limited, annulled, or restrained, except by judicial process, according to the principles of law." So that the Maine Legislature had manifestly no authority to intermeddle with the charter of the college granted by Massachusetts, unless with the consent of the State of Massachusetts first had and obtained. She had not consented as was decided in that case, and if not, it was not at all necessary in this, any more than in the New Gloucester school-fund case, to fix the

City Louisville
vs.
Pres. & Trus.
University.

character of the corporation as private, in order to shield it from the innovations attempted by the Legislature of the State of Maine. Neither of the cases last cited can therefore be recognized as sufficient authority to control my opinion as a member of this court, as to the character of the charter of the Louisville University, or as to the validity of the amendments thereto contained in the city charter.

The opinion of the Supreme Court of Alabama, pronounced in the case of the *University of Alabama vs. Winston*, 5 *Stewart and Porter*, 7, are in support of the views entertained by me, as expressed in this dissenting opinion, both as to the true character of the corporation, and the public control over it. (See also *Angell & Aimes on Corporations, page* 9, *sec.* 14, *page* 27, *sec.* 31, *page* 31, *sec.* 32, *page* 32, *sec.* 34.)

There are in the legislation of this State, and doubtless of the other States of the Union, numerous instances of legislative enactments amendatory to the charters of public educational corporations, the validity of which has not been questioned, and of which no complaints have been made, for the obvious reason, doubtless, that the legislative authority over such institutions has not hitherto been doubted in this State. (See 2 *Litt. Laws*, 107, 108, 208, 234, 240, 378, 389; 3 *Litt. Laws*, 206, 255, 277, 279, 409.) By an act of 1798 the Legislature united and merged two institutions, the Transylvania Seminary and the Kentucky Academy, into one, and named it the Transylvania University, and appointed an entire new board of trustees, to whom the other two institutions were surrendered, with their rights and obligations, assuming that this was done upon the application of a *majority* of the trustees of the seminary and academy.

By an act of assembly passed 4th of December, 1800, eight new trustees were appointed for the Jefferson Seminary of learning clothed with full powers as such, without the consent of the existing trustees for aught that appears in the act.

CITY LOUISVILLE
vs.
PRES. & TRUS.
UNIVERSITY.

By an act passed 18th of December, 1804, upon assuming that the former trustees had forfeited their offices as such, twelve new trustees are appointed, and clothed with full powers to take charge of the Jefferson Academy.

By an act approved 19th of December, 1805, it is declared that the former trustees, appointed under the "act establishing the Franklin Academy," had forfeited their powers by non-uses, and nine new trustees are appointed in their place, and clothed with their powers, for all that appears, without their consent.

By an act passed 21st of December, 1805, various radical alterations and amendments were made to acts incorporating the Shelbyville, Newton, and Logan Academies, and other institutions of learning in the State, including the Kentucky Seminary, involving the increase and diminution of the number of the trustees, the removal of some and substitution of others in their places, and the abridgement or enlargement of their powers, &c., all apparently at the discretion of the Legislature.

By an act approved 27th of December, 1806, the Legislature, assuming that a *majority* of the trustees had so agreed, unite the Newton Academy and Logan Seminary into one institution, appoint a new set of trustees with full powers, and create an entire new corporate institution, and vest in it all the rights, immunities, funds, and property which had previously belonged to both of the others thus merged into it. These and other acts which might be referred to, prove that in Kentucky at least the legislative *power* to alter, amend, or repeal the charters of public institutions of learning has been freely exercised, and hitherto never questioned, and in my judgment it should not now be questioned for the first time; and perhaps had it not been that the interesting questions presented in this case were expressly submitted for adjudication by the tenth section of the thirteenth article of the city charter, that power would not have

been questioned by the gentlemen who are defendants in this proceeding. For the reasons given, I am constrained to differ in opinion from the majority of the court.

The opinion in this case was delivered on the 4th day of July, 1854, but did not come to the hands of the Reporter until after the publication of the 14th volume of Reports.